STATE EX REL., COLLINS, ATTORNEY GENERAL *v.* JACKSON ET AL.

[81 South. 1, In Banc, No. 20592.]

1. STATUTE. *Validity. Evidence. Legislative journals.*
    The journals of the two houses of the legislature cannot be resorted to by the courts to determine as to whether or not an act was passed in violation of section 89 of the Constitution.

2. QUO WARRANTO. *Subject of action. Validity of county organizations.*
    *Quo warranto* is the proper remedy to test the validity of the formation of a county under a legislative act providing therefor.

3. SAME.
    The formation of a county under a legislative act providing therefor was not void under section 33 of the Constitution, providing for a referendum, because such formation took place within ninety days after the adjournment of the legislature passing the act.

4. CONSTITUTIONAL LAW. *Amendment. Construction with reference to other provisions.*
    In construing a constitutional provision it is the duty of the court to have recourse to the whole instrument, if necessary, to ascertain the true intent and meaning of any particular provision, and if there is an apparent repugnancy between different provisions, the court should harmonize them if possible, so as to give effect to all.

5. CONSTITUTIONAL LAW. *Construction of provisions. Appeals.*
    Construing sections 75 and 33 of the Constitution, both together, the court held that section 33 as amended was not intended to

affect any law in any manner until referendum petitions were filed to it; that this amendment in no way meant to qualify or limit the time of the taking effect of laws in general.

6. **Statute.** *Construction. Initiative and referendum.*
   The referendum part of the amendment to section 33 of the Constitution applies to laws which have already become operative.

7. **Same.**

   Since section 75 of the Constitution is not repealed by this amendment, the legislature has the power to put in effect any law, either general or local, in its nature, at any time it may see fit.

Appeal from the circuit court of Washington county. Hon. H. H. Elmore, Judge.

Separate proceedings in *quo warranto* by the state on the relation of Ross A. Collins, Attorney-General, against J. S. Jackson and others. Judgment for respondents, on demurrer, and relator appeals.

The facts are fully stated in the opinion of the court. No brief of counsel on either side found in the record.

*R. H. & J. H. Thompson, Barnett & Perrin, Barbour & Henry, E. L. Brown* and *R. R. Norquist,* for appellant.

*Robt. B. Mayes, Robt. Powell, Knotts & Jones, N. W. Sumrall, T. E. Mortimer, Jesse D. Jones* and *J. M. Cashin,* for appellee.

Sykes J., delivered the opinion of the court.

*Quo warranto* proceedings were filed by the attorney-general on behalf of the state in the circuit courts of Washington and Humphreys counties to test the validity of the formation of Humphreys county. Proceedings were filed in both counties against certain alleged members of the board of supervisors of Humphreys county. One of the suits in Washington county was filed against those members of the board of Humphreys county who were citizens of Washington county before the attempted formation of Humphreys county, and the other,

filed in this county, was against the five alleged members of the board. Three suits are brought here on appeal, two of them are from Washington county, and one from Humphreys county. Demurrers were sustained in the circuit courts to the *quo warranto* informations in all three cases.

This litigation arises from the following facts: Under chapter 348 of the Acts of the legislature of 1918, an act authorizing the creation of a new county to be called Humphreys county, and providing for the organization of same from portions of lands situated in Washington, Yazoo, Holmes, Sharkey, and Sunflower counties, Humphreys county was attempted to be organized, and every step of this organization was taken within sixty-six days from the approval of the act by the Governor. It is not necessary to set forth in detail the provisions of the act providing for the creation of this county. While the informations alleged some irregularities in the carrying out of the act, and in the notice for the election in the prescribed territory, there is no charge of fraud, and no allegations that the result of the election was not a full and fair expression of the wishes of the people in this territory. In the statement of the case counsel for appellant mention certain alleged violations of the act, but do not cite any authorities sustaining this position, nor in fact argue these questions in their brief. We therefor say, in passing, that these irregularities would not vitiate the election. *Hatten* v. *Bond,* 112 Miss. 590, 73 So. 612; *Shines* v. *Hamilton,* 87 Miss. 384, 39 So. 1008; *Johnson* v. *Board of Supervisors,* 113 Miss. 435, 74 So. 321; *Pradat* v. *Ramsey,* 47 Miss. 24.

The information also charges that this act was passed by the legislature without a proper report of either the committee of the Senate or the House on local and private legislation giving the reasons why it should pass. That this was in violation of section 89 of the Constitution. This court, however, has repeatedly held that

the journals of the two houses of the legislature cannot be resorted to by the courts. *Ex parte Wren*, 63 Miss. 512, 56 Am. Rep. 825; *Hunt* v. *Wright*, 70 Miss. 307, 11 So. 608; *Mayor etc.*, v. *State*, 102 Miss. 663, 59 So. 873, Ann. Cas. 1915A, 1213.

The contention of counsel for appellant that the formation of Humphreys county is void is based upon amended section 33, art. 4, of the Constitution. They contend that because of this amendment no act of the legislature can become effective until ninety days after the adjournment of the legislature, unless the act is passed as an emergency act under section 3 of this amendment. The entire argument of counsel for appellant and the authorities cited by them are directed to this principal and, we think, decisive question in the case. Counsel for appellee contend, among other things, that *quo warranto* is not the proper method of procedure in this case. This court, however, has lately decided this very question against the contentions of appellee in the case of *Howie, District Attorney*, v. *Brantley*, 113 Miss. 786, 74 So. 662, Ann. Cas. 1917E, 723.

The proper construction of this amendment has received the most careful consideration of this court. The only part of the amendment with which we are here concerned is that part which relates to the referendum. This amendment is commonly known as the initiative referendum amendment, and its constitutionality was passed upon by this court in the Brantley Case, above cited. The referendum part of it is as follows:

"Sec. 33. The legislative authority of the state shall be vested in a legislature which shall consist of a Senate and a House of Representatives, but the people reserve to themselves the power . . . at their own option, to approve or reject at the polls any act, item, section or any part of any act or measure passed by the legislature. . . .

"2. The second power reserved by the people is the referendum, and it may be ordered either by a petition signed by the required number of qualified voters or by the legislature, as other bills are enacted. . . . The filing of a referendum petition against any one or more items, sections or parts of any measure shall not delay the remainder from becoming operative. Referendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety (90) days after the final adjournment of the session of the legislature at which such measures were passed, except when adjournment shall be taken temporarily for a longer period than ninety (90) days, in which case such petition shall be filed not later than ninety (90) days after such temporary adjournment. All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken.

"3. If it shall be necessary, for the immediate preservation of the public peace, health or safety, then a measure shall become effective without delay; such necessity shall be stated in one section, and if, upon a yea and nay vote, three-fourths of those voting in each house shall vote in favor of the measure going into immediate operation, such measure shall become operative at once. It shall be necessary to state in such section the facts constituting such emergency. . . . If a referendum petition is filed against such emergency measure, such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the voters voting thereon, it shall be thereby repealed.

"4. . . . Any measure submitted to the people, as herein provided, shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise. Such measure shall be in operation on and after the thirtieth day after the election at which it is approved," etc.

The contention of the able counsel for appellant is very well expressed by them as follows:

"Our proposition is that no legislative act can be made operative within ninety days of the 'final adjournment of the session,' unless 'it shall be necessary for the immediate preservation of the public peace, health or safety,' and then only in case that by the act itself 'such necessity shall be stated in one section,' and, further, be passed 'upon a yea and nay vote', of 'three-fourths of those voting in each house.' A mere reading of section 33 as amended will demonstrate that we are right."

Counsel contend that, under paragraphs 1 and 2 of this amendment, since the people have reserved to themselves the option to approve or reject within ninety days laws passed by the legislature, and it being further provided in paragraph 2 that "the filing of a referendum petition against any one or more items, sections or parts of any measure shall not delay the remainder from becoming operative," and the further provision that "all measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken," demonstrates that no act (except emergency acts) passed by the legislature can take effect until ninety days after its adjournment, or until the time for the filing of referendum petitions has passed, which time is ninety days after adjournment, section 3 of the act points out and provides explicitly what kind of laws may be made to take effect immediately, namely, those laws "necessary for the immediate preservation of the public peace, health, or safety." This section provides that this necessity shall be stated in the act and be passed by a three-fourths yea and nay vote. This act upon its passage becomes a law, and is not suspended by the filling of a referendum petition against it, but remains the law until it is voted upon by the people, "and if it is then rejected

by a majority of the voters voting thereon, it shall be thereby repealed.

Our attention is especially called by counsel for appellant to the language used in section 3 relating to laws passed under it, which are usually called emergency laws, and the language relating to other laws in sections 2 and 4; for instance, section 2 says, "The filing of a referendum petition against any one or more items . . . shall not delay the remainder from becoming operative;" that this clause clearly indicates that no part of the law had become operative when this petition was filed, and this clause, "All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken;" that the law could not remain in abeyance unless it was already in abeyance; that section 3 relating to emergency laws, provides that, "if it is then rejected by a majority of the voters voting thereon, it shall be thereby repealed," thereby using the proper phraseology relating to a law which had been operative; that in paragraph 4 it is provided that "any measure submitted to the people, as herein provided, shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise;" that all of these expressions, "shall not delay," "shall remain in obeyance," shall take effect and become law," show that these acts are not effective laws, and cannot become effective until the ninety days has expired.

There is no express provision in this amendment providing that no law of the legislature shall be effective for a period of ninety days except the emergency laws. The construction of appellant that the legislature is prohibited by this law from making an act effective at any time it so pleases will have to be implied from the phraseology of the amendment which we have quoted. Counsel for appellant have apparent authority to sustain their contention. They have cited cases from Orgeon, Missouri, and Arkansas in which the language used in

the opinions apparently sustains their contentions. They contend that, when we adopted this initiative referendum amendment, we practically took our amendment from that of these three states, and that the construction given to these amendments by the supreme courts of these states before we adopted the amendment should at least "be very persuasive" with this court. There are certain differences between our amendment and the amendments of these three states which are quite material, and there are differences between other sections of their Constitutions and ours which also have to be considered in construing our amendment. In the initiative referendum amendments of Arkansas, Missouri, and Oregon laws necessary "for the immediate preservation of the public peace, health or safety" are especially excepted from the referendum. In our amendment no law or act of the legislature of any kind is excepted from the referendum. The amendment in neither one of these states contains this provision:

"All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken."

But they do contain the provision found in section 4 of our law which reads as follows:

"Any measure submitted to the people, as herein provided, shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise."

The leading case relied upon by counsel for appellant is that of *Sears* v. *Multnomah County*, decided by the supreme court of Oregon in 1907, reported in 49 Or. 42, 88 Pac. 522. The Arkansas and Missouri decisions are based upon this Oregon decision. At the time this amendment was adopted in Oregon this provision was also in its Constitution, section 28 of article 4, and reads as follows:

"No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of emergency; which emergency shall be declared in the preamble or in the body of the law."

The Constitution of Missouri also contains a provision similar to section 28, art. 4, of the Constitution of Oregon. Under section 28 it seems that the legislature of Oregon was accustomed to pass emergency bills as it saw fit. It passed such a bill in compliance with this section, but which did not comply with the emergency provision of the amendment. The law was made effective at once instead of within ninety days from the end of the session.

The question presented to the court for decision was whether or not, in view of the amendment which expressly defined emergency measures, the legislature could pass a measure as an emergency measure which did not come within the definition prescribed by the amendment. The contention as stated in the opinion of the court is as follows:

"It is claimed by the appellant that the emergency clause that will authorize an act to take effect upon its approval must be such an emergency as comes within the exception contained in the amendment of said section 1 above quoted. Respondent claims that this amendment of section 1 does not affect section 28 of article 4, and that the legislature may still give immediate effect to any act, by the terms of section 28, to which it applied previous to the amendment of section 1."

The court then goes on to say: "We think that to put such a construction upon the amendment of section 1 would violate its true purpose and intent. . . . We cannot give our consent to this construction of the amentment, but rather hold that the exception in the amendment should be read into section 28 of article 4. Otherwise the reservation in the amendment that 'the

people reserve power at their own option to approve or reject at the polls any act of the Legislative Assembly' would be rendered futile. Thus, instead of leaning 'in favor of that construction which will render every word operative,' . . . the effect would be to make the amendment idle and nugatory. We believe the amendment makes its own exceptions, and, if those conflict with section 28 of article 4, they will constitute a limitation upon it to that extent.''

The next part of this opinion gives the reason, the underlying principle, upon which it is founded, and we especially emphasize this quotation from it as it makes prominent the vital difference between that amendment and ours. It is:

''That an act may take effect under a general emergency clause, and yet be subject to the referendum, is clearly contrary to the intent of the amendment, and would produce disastrous results.''

This is exactly what may happen under our amendment. Our amendment especially provides for the taking effect of emergency laws, and that they cannot be suspended by the filing of referendum petitions, and can only be repealed by an adverse vote thereon. The Oregon opinion then continues as follows:

''The clause in the amendment which reads, 'Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise,' clearly means that a law upon which the referendum is invoked cannot take effect prior to its approval by the vote; and consequently no act that is subject to the referendum can be made to go into operation for ninety days after the adjournment of the session or its approval by vote.''

In construing this amendment and section 28 of its Constitution there was no contradiction between section 28 and the amendment as to when a law became operative. Section 28 expressly provides:

"No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of emergency."

The amendment made no change in the time when laws were to take effect under section 28. Section 28 does not attempt to define what are emergency laws The amendment does, and the court in this case held that the emergency part of the amendment defining what emergency measures were was a limitation on section 28. Construing section 28 and the amendment together, the Oregon court declared that it was contrary to the intent of the amendment for an act to take effect and yet be subject to the referendum. By the express terms of our amendment, section 3 thereof, emergency measures are made to take effect at once; yet they are subject to the referendum and may be repealed by an adverse vote. So the reason given for the holding of the Oregon court in this opinion does not exist under our amendment.

In the case of *State* v. *Moore,* decided by the supreme court of Arkansas in 1912, reported in 103 Ark. 48, 145 S. W. 199, the question for decision was whether or not a law passed by the legislature of Arkansas which provided that it should take effect from and after its passage as a matter of fact became effective before ninety days after the adjournment of the legislature under the initiative and referendum amendment to the Arkansas Constitution, which is similar to that of Oregon. There was no provision in the Arkansas Constitution relating to the time when laws should become effective. The Arkansas Supreme Court, in holding that no law became effective until ninety days after the adjournment of the legislature, except the emergency laws expressly mentioned in the act, stresses in its opinion the dominant idea presented in the Oregon opinion as follows:

"It was not intended that an act passed by the legislature should take effect conditionally and subject to
119 Miss.—47.

the referendum, and continue in force from its passage, if the referendum was not ordered, or that an act once in force should be suspended by the referendum till its approval by the people.''

The Missouri case of *State* v. *Carter*, decided in 1914, reported in 257 Mo. 52, 165 S. W. 773, had under consideration the narrow point of whether or not the filing of a referendum petition to a law passed by the legislature would prevent it from becoming operative ninety days after the adjournment of the legislature. In Missouri a section of the Constitution provided that an act became effective ninety days after the legislature adjourned. The referendum amendment provided that:

"Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise." Article 4, section 57.

This amendment further provided that these referendum petitions should be filed within ninety days after the adjournment of the legislature. The Missouri supreme court held that the filing of the petitions suspended the going into operation of the act until the law was approved by a vote of the people as the amendment expressly provided. The opinion of the court, however, deals with the entire amendment, and quotes from the Oregon and Arkansas opinions above referred to. That portion of the opinion dealing with this question is as follows:

"Aside from these most persuasive cases from other jurisdictions, by our own construction of section 57 of article 4 of our Constitution, as amended in 1908, we feel constrained to hold, without doubt or hesitation, that all acts of the legislature touching which the referendum may be properly invoked are suspended by the filing of a legal, sufficient, and timely petition for the submission of such acts to a vote of the people for their approval or rejection, and that all such acts take effect when and only after a vote of the people has approved

them at an election in which a majority of the votes are cast in favor of such act.''

It is to be noted that our amendment expressly provides that: ''All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken.''

Section 36 of article 4 of the Missouri Constitution provides that: ''No law passed by the General Assembly, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency,'' etc.

So in the Missouri case the act had not taken effect when the referendum petition was filed, and the amendment expressly provided that it should not then take effect until approved by vote of the people.

In construing this amendment (section 33 of our Constitution), it is our duty to consider also section 75 of the Constitution, and, if possible, to harmonize and give effect to both sections. If this cannot be done, and it is clear that the amendment repeals section 75 by implication, then it is our duty to so hold. We must also bear in mind that repeals by implication are never favored, and that the duty rests on this court to harmonize and uphold both section 75 and the amendment, if it can be done. Section 75 reads as follows:

''No law of a general nature, unless therein otherwise provided, shall be enforced until sixty days after its passage.''

This section provides a time when laws of a general nature become effective when the law itself does not so provide. The legislature under this section has the right to make a law become effective at any time it so desires. Nearly all bills passed by our legislature provide that they shall become effective from and after their passage. It is the exception to the rule when they do not. It is to be presumed that the legislature which submitted this initiative referendum amendment

to the people was familiar with section 75 of the Constitution. If it had intended this amendment to repeal section 75, it would most likely have expressly said so in this amendment. If it had meant to repeal it by implication, it would have further provided in this amendment that no act passed by the legislature should become effective until ninety days after its adjournment, or words to this effect.

The legislature which inserted this amendment into the Constitution during its general session of 1916, and after the insertion of the amendment in the Constitution, passed a great many very important measures, practically all of which, if not all, were made to take effect from and after their passage. The legislature of 1918, composed of the same members as that of 1916, passed its acts in the same manner. It is therefore manifest that the legislative interpretation placed upon this amendment was that it did not repeal section 75. The Governor, by his approval of these acts, has therefore interpreted the act for the executive department in the same manner. Mr. Cooley, in his work on Constitutional Limitations (3d Ed.) section 57, lays the rule down as follows:

"It is therefore a rule of construction that the whole is to be examined with a view to arriving at the true intention of each part; and this Sir Edmund Coke regards the most natural and genuine method of expounding a statute. 'If any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another.' And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict,

the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.

"This rule is especially applicable to written Constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justifiable in declaring any portion of a written Constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."

Neither the Oregon, Arkansas, nor Missouri courts were asked to hold that the amendment by implication repealed a part of another section of the Constitution. All that was held on the Oregon case was that it limited another section, or restricted its operation. To hold with appellants in this case would not be to hold that section 75 was limited or restricted in any way, but that it was absolutely repealed by implication. The duty of the courts to harmonize and, if possible, give effect to every section and every part of a constitution is further well stated in 6 R. C. L. 47, section 41, as follows:

"In construing a constitutional provision it is the duty of the court to have recourse to the whole instrument, if necessary, to ascertain the true intent and meaning of any particular provision, and if there is an apparent repugnancy between different provisions, the court should harmonize them, if possible. Frequently the meaning of one provision of a Constitution, standing by itself, may be obscure or uncertain, but is readily apparent when resort is had to other portions of the

same instrument. It is therefore an established canon of constitutional construction that no one provision of the Constitution is to be separated from all the others, and to be considered alone, but that all the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purpose of the instrument. An amendment duly adopted is a part of the Constitution, and is to be construed accordingly. It cannot be questioned on the ground that it conflicts with pre-existing provisions: on the contrary, if there is a real inconsistency, the amendment must prevail, because it is the latest expression of the will of the people. In such a case there is no room for the application of the rule as to harmonizing inconsistent provisions.''

We also quote the first part of section 42, 6 R. C. L. p. 48, as follows:

''Another elementary rule is that, if possible, effect should be given to every part and every word, and that unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous. Hence as a general rule, the court should avoid a construction which renders any provision meaningless or inoperative.''

It is only in cases where there is a real inconsistency between the section of the Constitution and the amendment, or where they are irreconcilable according to the reasonable rules of construction, that the section must be considered as repealed.

As stated in 12 Corpus Juris, section 55, p. 707:

''The presumption and legal intendment is that each and every clause in a written Constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order to ascertain both its intent and general purpose and also the meaning of each part. It follows, therefore, that, as far as possible, each provision must be construed so as to harmonize with all others, yet with a view to

giving the largest measures of force and effect to each and every provision that shall be consistent with a construction of the instrument, as a whole. Different sections, amendments, or provisions relating to the same subject must be construed together and read in the light of each other.''

It is to be presumed that the legislature was not only familiar with section 75 of the Constitution, but that the amendment was not meant to conflict with it. Under section 75 the legislature may make an act effective at once or delay its operation as long as it desires. While the general trend of legislation is to make bills effective from and after their passage, this is not always the case. Consequently the drafters of the amendment are presumed to have known that referendum petitions could be filed against some laws after they had been put into operation, and against others before they become operative. If the law were operative at the time the petitions were filed, then that portion of section 2 reading that ''the filing of these petitions shall not delay the remainder from becoming operative'' would not affect one way or the other the remainder of the law. If the law had not become operative, this provision would not delay the remainder from becoming operative. The last sentence in section 2, which reads, ''All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken,'' simply means that the filing of the referendum petition would put the law in abeyance or suspend the operation of the law, provided it had already become effective. The filing of the petition would suspend the operation of the law, and the law would thereafter remain in abeyance until the vote is taken. A law passed under section 3 of this act, to a certain extent, is of a higher nature than a law otherwise passed, in that it becomes effective immediately, and cannot be suspended by the filing of referendum petitions, but remains in force and effect until an adverse vote of the people

upon it. In case of an adverse vote it is repealed. In case of a favorable vote it continues to be the law. This construction of the amendment together with section 75 is entirely reasonable and gives to each its full force and operation. It gives force and effect to every sentence and every clause in both the amendment and section 75. When thus construed, they are not antagonistic or inharmonious. It would violate the canons of construction to attempt to construe the amendment (section 33) without at the same time considering section 75.

Construing them both together, it is perfectly plain that section 33 as amended was not intended to affect any law in any manner until referendum petitions were filed to it; that this amendment in no way meant to qualify or limit the time of the taking effect of laws in general.

It is further contended by the appellant that the referendum part of our amendment is not meant to apply to a law which has already become operative or effective, but that the way to repeal an effective law is to proceed under the initiative part of this amendment. In this, however, the able counsel for appellant are mistaken, as an examination of section 3 of this amendment shows that referendum petitions may be filed against emergency laws which have already become operative as expressly provided in that section.

The fact that the bill providing for the organization of Humphreys county was a local bill makes no difference in the decision of this case. If section 75 of the Constitution is not repealed by this amendment, then the legislature has the power to put in effect any law, either general or local in its nature, at any time it may see fit.

A well-considered case is that of *Beall, Sheriff,* v. *State,* 131 Md. 669, 103 Atl. 99. Section 31, art. 3, of the Maryland Constitution provides that: "No law passed by the General Assembly shall take effect until the first day of June next after the session at which

it may be passed, unless it be otherwise expressly declared therein."

Article 16 of the Maryland Constitution is a referendum section. Section 2 of this article provides that: "No law enacted by the General Assembly shall take effect until the first day of June next after the session at which it may be passed, unless it contain a section declaring such law an emergency law and necessary for the immediate preservation of the public health or safety," etc.

The law passed and questioned was one prohibiting the sale of liquor in Prince George county. The question for decision before the court was whether or not the referendum amendment repealed the above section of the Constitution or merely limited it to those laws or acts of the legislature referable to the people. The act in question was not referable to the people, and consequently it was contended that the referendum amendment did not affect its operation under section 31. The court held that section 31 was not repealed, but was only modified and limited as to those acts which could be referred to the people. We now quote from this opinion:

"It is a familiar principle in the construction of a Constitution that the construction should be upon the whole instrument, and effect given to every part of it, if that be possible, and that, unless there be some reasons to the contrary, no part of the fundamental law should be disregarded, or rejected as inoperative. In seeking for the meaning of a particular provision or article, it must be examined in the light of its origin, the purpose it was intended to serve, as well as the evils it was intended or supposed to remedy."

Another interesting case in which all four of the judges of North Dakota expressed their views in that of *State* v. *Crawford,* 36 N. D. 385, 162 N. W. 710. A majority of the court, however, did not agree upon the

point for decision in this court, and we will not burden this opinion with any quotation from that case.

Several states, among them Arizona (article 4, pt. 1, section [4]) and Washington (Amendment 7), contain a provision that—"No act, law, or bill subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted."

We are of opinion that, if the drafters of this amendment to our Constitution had meant to make it repeal section 75 by implication, then they would have used similar language to that above quoted.

In conclusion we desire to gain empasize the fact that the underlying reasons for the opinions of the courts of Oregon, Missouri, and Arkansas are that the intent of their amendments was that no law subject to the referendum could become operative until the time for filing the referendum petitions had passed; that it was an anomaly that a law could be a law to-day and not a law to-morrow; while under our amendment this very anomaly, by section 3 of the emergency measure, is made to take place, and it is there clearly provided that a law may be a law to-day and not a law to-morrow. The reason of the Oregon rule therefore ceases, or rather does not exist in Mississippi.

It therefore follows that the initiative referendum amendment does not repeal section 75 of the Constitution, and that Humphreys county is a de jure county.

The judgments of the lower courts are affirmed.

*Affirmed.*

SMITH, C. J., and ETHRIDGE, J., dissenting.

ETHRIDGE, J. (dissenting).

I am unable to concur in the decision of the majority for two reasons: First, because the constitutional amendment to section 33 known as the initiative and referendum amendment suspends the operation of an act of the legislature not containing an emergency

clause for ninety days after the passage of the act; and, second, because the terms of the act providing for an election under section 260 of the Constitution were not complied with in this case, and because the act made no provision for holding the elections in parts of Sunflower and Sharkey counties in which division there was no election precinct, the act failing to provide a place to hold the election.

I shall take up the initiative and referendum propositions first.

Chapter 348, Laws of 1918, provides for the creation of a new county to be called Humphreys county, and provides for the organization of same. This act, by the terms of section 24, was to take effect and be in force after its passage, and was approved March 28, 1918.

The act contained no recital that there was any emergency requiring it to go into operation at once for any reason in accordance with the requirements of the third clause of section 33 of the Constitution as amended. Prior to March 29, 1916, the whole legislative power of the state was vested in the legislature, consisting of a Senate and House of Representatives. On the 29th day of March, 1916, however, the legislature inserted the initiative and referendum amendment now constituting section 33 of the Constitution. By the first section of this amendment the people reserved the' initiative power to enact legislation which is not involved in this suit.

By the second section the people reserved the power of referendum to themselves. Section 2, 3, and 4, so far as pertinent to this suit, are set out, and the particular parts specially bearing on the construction of this act underscored.

"2. The second power reserved by the people is the referendum, and it may be ordered either by a petition signed by the required number of qualified voters or by the legislature, as other bills are enacted. Not more than six thousand (6,000) qualified voters may be required to sign and make valid referendum petition.

The filing of a referendum petition against one or more items, sections or parts of any measure shall not delay the remainder from becoming operative. Referendum petitions against measures passed by the legislature shall be filed with the secretary of state not later than ninety (90) days after the final adjournment of the session of the legislature at which such measures were passed, except when adjournment shall be taken temporarily for a longer period than ninety (90) days, in which case such petition shall be filed not later than ninety (90) days after such temporary adjournment. All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken.

"3. If it shall be necessary, for the immediate preservation of the public peace, health or safety, then a measure shall become effective without delay; such necessity shall be stated in one section, and if, upon a yea and nay vote, three-fourths of those voting in each house shall vote in favor of the measure going into immediate operation, such measure shall become operative at once. It shall be necessary to state in such section the facts constituting such emergency: Provided, that an emergency shall not be declared on any franchise or special privilege or act creating any vested right or interest, or alienating any property of the state. If a referendum petition is filed against such emergency measure, such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the voters voting thereon, it shall be thereby repealed.

"4. The word 'measure' as used herein means any law, bill, resolution, constitutional amendment, or any other legislative measure. All elections on general, local and special measures referred to the people of the state shall be held at the general state or congressional elections, except when the legislature shall order a special election. Any measure submitted to the people, as herein provided, shall take effect and become law

when approved by a majority of the votes cast thereon, and not otherwise."

It will be observed that in paragraph 2 it is provided that: "The filing of a referendum petition against one or more items, sections or parts of any measure shall not delay the remainder from becoming operative."

This language clearly implies that the act is not operative in any of its parts upon the filing of a petition for referendum within the ninety days provided for in the Constitution. Further on it provides that: "All measures referred to a vote of the people by referendum petitions shall remain in abeyance until such vote is taken."

This is clearly an implication that the act is in abeyance at the time of the filing of the petition. How can it be said that an act remains in abeyance if it was in full force and effect on the filing of the petition? It could not remain in abeyance unless it was already in abeyance, and if these clauses stood alone it seems to me it would be sufficient to warrant the court in holding that the act did not become effective until after the expiration of the ninety days provided by the Constitution for the filing of the petition for referendum.

When we take the terms of section 3, however, it seems to me that the conclusion is inescapable that no act or measure passed by the legislature can become operative except according to the terms of this paragraph, and only such acts can become operative at once as shall be necessary for the immediate preservation of the public peace, health or safety, and in cases where it is necessary for the preservation of the public peace, health or safety, the act must contain a section stating such fact constituting such necessity or emergency, and then the act must be put in force on a roll call with yea and nay vote showing three-fourths of those voting in each house in favor of the measure going into immediate operation. It seems to me that

no language could be plainer than the language of this paragraph quoted above. The act distinctly says that in cases named then the measure shall become effective without delay, and such measure shall become operative at once.

Under paragraph 4 the word "measure," as used in the constitutional provision, means any law, bill, resolution, or constitutional amendment, or any other legislative measure. The referendum therefore applies to both public and private acts of the legislature, and to general and local legislation. This paragraph provides again that any measure submitted to the people as herein provided shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise. If the act takes effect before the petition is filed, how could it be made to take effect again on a different contingency, or on a different condition? The measure passed by the legislature against which an initiative petition is filed by the very terms of the Constitution shall take effect and become law when approved by a majority of votes cast thereon, and not otherwise. How can a measure become a law on this contingency if it was already a law before the voting happened? Under the majority opinion the act has the force of law all the while; yet under this clause it is provided that it shall take effect and become a law on this contingency, and not otherwise.

If the framers of the amendment had intended the act to become a law on its passage, it would merely have provided for the suspension of the law on the filing of the petition, but the constitutional amendment nowhere provides a suspension in terms, or, as I see it, by any fair implication. It is undertaking to keep an act of the legislature in abeyance until a vote is taken thereon, and under the terms of the Constitution it does not become a law until so approved by the people.

It is true that section 75 of the Constitution, enacted long prior to the initiative and referendum amendment,

provided that an act of the legislature of a general character would not become effective until sixty days after the approval of the act, unless it had a clause fixing an earlier date.    The spirit and purpose of this section of the Constitution was to allow a period to elapse after the passage of a law before it became effective, except in case of an emergency, to the end that the people whose rights and liberties might be affected might acquire knowledge of the terms of the law.

As I understand the rule, an amendment to a Constitution is not to be pared away by construction to prevent it modifying some other section or clause of the Constitution.    The amendment must be construed so as to give it full force and effect, and if, so construed, it conflicts with another provision theretofore in the Constitution, the effect would be to repeal or modify such section of the Constitution.    While repeals by implication are not favored in law, and while the court will construe as far as possible the two provisions so as to give each effect, yet in case of an original provision and an amendment, the construction harmonizing the two sections must be such as not to impair the full purpose and scope of the new provision.

In all of the cases in other states which have construed constitutional provisions which have similar terms as to when an act would become effective, the courts have held that it did not become effective until the time for filing the referendum petitions had expired.    These cases have been referred to in the majority opinion, and I invite a careful reading of the decisions quoted from in the majority opinion upon this proposition.    I do not think these opinions can be interpreted so as to harmonize with the majority opinion. *Sears* v. *Multnomah County,* 49 Or. 42, 88 Pac. 522; *State* v. *Moore,* 103 Ark. 48, 145 S. W. 199; *State* v. *Carter,* 257 Mo. 52, 165 S. W. 773; *State ex rel. Attorney General* v. *Crawford,* 36 N. D. 385, 162 N. W. 710, Ann. Cas. 1917E, 955.    In

the last case cited it is true that each of the five judges wrote separate opinions, but the discussions are valuable.

The case of *Beall* v. *State ex rel. Jenkins*, 103 Atl. 99, is. the only one of the cases cited whose reasoning and language supports the conclusion of the majority. In that case, however, the initiative and referendum to the Constitution do not apply to the law in question. Section 6 of the act there construed provided that no law licensing, regulating, prohibiting, or submitting to local option the manufacture or sale of spirituous liquors shall be referred or repealed under any act of the provisions of this article. All that was said in that opinion as to the effect filing a petition would have upon an act giving effect is pure dictum, and has no application as authority. I think the reasoning does not accord with the reasoning of the weight of authority where the question has been properly presented and passed upon.

The majority opinion says that the legislature which inserted this amendment in the Constitution after such insertion passed a great many important measures, practically all of which were made to take effect from and after their passage, and that the legislature of 1918 was composed of the members of that of 1916, and passed acts in the same manner, and it is therefore manifest that the legislative interpretation placed upon the amendment did not repeal section 75, and that the Governor, in approving these acts, interpreted the act for the executive department in the same way. The construction of the amendment by the legislature or by the Governor is not important, because such construction has not been acquiesced in for a long time, and at all events will not be controlling or very influential with the court, whose sworn duty it is to uphold the Constitution according to its intendment as shown by the language used therein. It does not require deep research into legislative acts to show that the Constitution had but small influence in the halls of legislation

Bourke Cochran's classical ridicule of "the constitutional lawyer in legislative bodies" seems to have fallen in fertile soil in Mississippi, and the rules of procedure enacted by the constitutional convention obtain but small recognition at the hands of the legislature, although section 40 of the Constitution containing the oath for members of the legislature in part reads as follows:

"I will, as soon as practicable hereafter, carefully read (or have read to me) the Constitution of this state, and will endeavor to note, and as a legislator to execute, all the requirements thereof imposed on the legislature."

The Constitution is the body of laws enacted by the people in their sovereign capacity for the control and guidance of all officers and for the protection of all citizens of the state. It is the only shield that the people have from arbitrary power. Without the protection of the Constitution the legislature could jeopardize and destroy the most sacred rights of the citizen, and each citizen has a right to challenge the power of the legislature, and have the court adjudge whether the legislature was right or wrong in judging its own power, and it is the solemn duty of the court to uphold and protect people by upholding the Constitution regardless of any construction by any other officer or department of government. It is true that constructions long acquiesced in are presumed to be correct, but this is only a presumption, and wherever they are manifestly incorrect, it is the duty of the court to adopt a true construction of the Constitution. There is no place where the Constitution ought to be more sacredly observed than in legislative bodies of the state, and every act should be carefully scrutinized in the legislature to see that it does not violate the Constitution, and every doubt as to the constitutionality of an act ought to be resolved against its passage. There is no ground here to appeal to any rule of construction that would depart

119 Miss.—48

from the true construction because of any supposed hardship or injustice, because the act here was promptly challenged in the courts.

Under the holding of the majority greater mischief and injustice can result than can possibly come from' my construction. Suppose a new law on the subject of prohibition should be passed, and old laws on that subject upheld, and the law by its terms became in force and effect on its passage; in such case those desiring to operate saloons can file a petition and suspend the law until the next general election, and in the meantime ply their trade without molestation or regulation. The same is true of the anti-lottery law, the loan shark law, the usury law, the privilege tax laws, the anti-trust laws, and all other laws enacted for the security of the people. It would only require six thousand votes to bring about such result, which, of course, is only a small fraction of the votes of the state, and these could easily be obtained. Under my views of construction the laws passed by the legislature and made operative at once would not be destroyed, but only suspended for ninety days, and this would not produce serious disturbance. The legislature could easily prevent any difficulty by inserting the emergency section, and no mischief at all would result. In cases of acts already passed my construction would not destroy them, but they are now in force, and possibly in all cases no evil would result at all. Those in the future would be passed to conform to the decision, and the people would have an opportunity to know what the law was before their rights or liberties were jeopardized by the law, or before they did some act forbidden by the law, or failed to obey some command of the law.

As to the second proposition, I think the judgment of the court below should be reversed for the reason that the law was not complied with in holding the election as shown by the declaration and demurrer.

The declaration alleges in reference to the failure to comply with the law as to holding the election the. following:

"That the commissioners so appointed for Sunflower county gave notice of said election by posting at the courthouse of said county and posting at Siddons' store, within the affected territory of said county, there being no regular election precinct within said territory, for the period of thirty days before said election, and nowhere else; that the commissioners so appointed for Washington county gave notice of said election by posting at the courthouse of said county at Belzoni and at Isola, those being the only two regular election precincts within the affected territory of said county, for a period of thirty days before said election, and nowhere else; that the commissioners so appointed for Holmes county gave notice of said election by posting at the courthouse of said county and at Putman's schoolhouse therein, which was the only regular election precinct within the affected territory of said county, for a period of thirty days before said election, and nowhere else; and the commissioner's so appointed for Sharkey county gave notice of said election by posting at the store of W. H. Ellis, Sr., there being no regular election precinct within the affected territory of said county, for a period of thirty days before said election, and nowhere else; and that the commissioners so appointed for Yazoo county gave notice of said election by posting only at Silver City, Louise, Midnight, and at the courthouse of said, county, for a period of thirty days before said election, but that, within the affected territory of said county, there were regular voting precincts at Silver City, Louise, Midnight, and Lake City, and no other notice of said election was given."

These allegations are confessed to be true by the demurrer.

Chapter 348; Laws of 1918, creating Humphreys county, provides in section 2 as follows:

"That upon the approval of this act by the Governor, he shall appoint fifteen commissioners, three from that portion of Washington county to be embraced in Humphreys county, and three from that portion of Holmes county to· be embraced in Humphreys county, and three from that portion of Yazoo county, to be embraced in Humphreys county, and three from that portion of Sharkey county to be embraced in Humphreys county, and three from that portion of Sunflower county to be embraced in Humphreys county, all of whom shall be residents of the proposed new county. It shall be the duty of the said commissioners to give notice as required for special elections and within ninety days after the approval of this act, to hold elections in their respective territories, submitting to the qualified electors residing respectively therein the question of the creation of the said new county; and there shall be printed on the tickets used in said elections the words 'For Humphreys County' and the words 'Against Humphreys County,' and the said commissioners shall make returns of said election to the secretary of state within the time provided by law for making returns for general elections showing the result thereof; and if it shall appear upon and by, and from, the returns of said election that a majority voting therein in the respective portions of the territories proposed to be taken from each county and embraced in the new county have separately voted therefor, then in that event the Governor shall issue his proclamation declaring said Humphreys county created."

Section 15 of the act reads as follows:

"That the registration books of the counties of Washington, Holmes, Yazoo, Sharkey and Sunflower shall be ·the registration books for the purpose of the election to be held in the territory embraced in the county of Humphreys as provided for in section 2 of

this act, and the commissioners to be appointed by
section 4 hereof [these election commissioners for the
county to be appointed after the county is created]
shall divide into convenient voting precincts the terri-
tory embraced in Humphreys county, and shall also
provide for the registration of the qualified electors in
said territory at least ten days before said election,
and the polling places as now established in the coun-
ties of Washington, Holmes, Yazoo, Sharkey and Sun-
flower and embraced in Humphreys county shall be
the polling' places for the purpose of holding the
election under sections 4 and 21 of. this act; but ·the
said commissioners, if they see proper, may establish
others, if the occasion requires.  It is not intended by
this act to limit the power of the board of supervisors
of Humphreys county to fix and change voting pre-
cincts and voting places.''

Section 22 of the act reads ,as follows:

''That for the purpose of ascertaining the qualified
voters authorized to vote upon the creation of said
county of Humphreys, as provided for in the second
section of this act, the commissioners provided to be
appointed as provided in section 2 of this act, shall
obtain from the circuit clerks of said counties of Wash-
ington, Holmes, Yazoo, Sharkey and Sunflower at
least ten days before the holding of said election a
list of the qualified registered voters in the respective
portions of said counties of Washington, Holmes, Ya-
zoo, Sharkey and Sunflower to be embraced in Hum-
phreys county, and said list to be certified to by said
clerks, and said commissioners shall have a number of
copies thereof, not less than ten made from said list
so certified by said circuit clerks for use in the holding
of said election.''

It will be noted from the above sections that on
passage of the act the Governor would appoint commis-
sioners therein named, and it was the duty of the com-
missioners to give notice as required for special elec-

tions, and within ninety days after the approval of this act to notify electors residing therein of the question of creating the new county.

The notice required in special elections is found in the chapter on registration and elections in section 4191, Code of 1906 (section 6825, Hemingway's Code), which reads as follows:

"The commissioners of election of the several counties to whom the writ of election may be directed, shall, immediately on the receipt thereof, give notice of such election by posting notices at the courthouse, and in each election district in the county, for as near thirty days as may be practicable; and the election shall be prepared for and held as in case of a general election."

It will be observed that the commissioners of election by this section are to give notice of elections by posting notices at the courthouse and each election district as near thirty days as may be practicable, and that the election shall be prepared for and held as in case of a general election.

According to the declaration as set out, and the brief for the appellee, there was a failure to post any notices at the precinct of Lake City, in Yazoo county. It will also be observed from the declaration that the election was not held at the precincts existing by law in the several counties; that is, the parts of the counties embraced in the proposed new county. In that part of the county of Washington embraced in the proposed new county there were two precincts, Belzoni and Isola. There was no election held at Isola, and the only place having an election was at Belzoni. In that part of the county of Yazoo embraced in the proposed new county, there were election districts and voting precincts in Silver City, Louise, Midnight, and Lake City. The only place where an election was held was Silver City.

The act of the legislature providing for the creation of Humphreys county, section 2 of which is quoted, does not provide for the commissioners to be appointed by the Governor to create any election districts or voting precincts. The act is entirely silent as to this so far as the election to vote on the county proposed is concerned. After the county was created by vote of the people, it became the duty of the state board of election commissioners to appoint a county board of election commissioners whose duty it was to divide the county into five convenient districts for the purpose of electing supervisors, justices · of the peace, and constables, and, after so dividing, it became their duty for holding the general election to elect one member of the legislature.

It will be noted, from the allegations of the declaration as to the election and notice of election held in Sunflower and Sharkey counties, that there was no election precinct in the parts proposed to be incorporated in the new county, and that the act · did not provide for any place for the holding of elections in such territory, nor did it confer upon the commissioners to hold the election upon the proposition of creating the new county power to create such election districts.

Section 260 of the Constitution reads of follows:

"No new county shall be formed unless a majority of the qualified electors voting in each part of the county or counties proposed to be dismembered and embraced in the new county, shall separately vote therefor; nor shall the boundary of any judicial district in a county be changed, unless, at an election held for that purpose, two-thirds of those voting assent thereto. The elections provided for in this and the section next preceding shall not be held in any county oftener than once in four years. No new county shall contain less than four hundred square miles; nor shall any existing county be reduced below that size."

It will be noted from this section of the Constitution that no county can be created unless a majority of the qualified electors voting in each part of the county or counties to be dismembered and embraced in the new county shall separately vote therefor. The constitutional policy is that an election shall be held and shall be held separately in each part of the new county that is taken from territories embraced formerly in other counties. It is incumbent upon the legislature in creating a new county to see that the machinery for carrying out the constitutional scheme is provided, and if it fails to provide adequate machinery, and if no adequate machinery exists under the general law, manifestly the county cannot be created.

The board of supervisors of a county are the only persons clothed with the authority by law under the present statutes with power to change election districts. *Perkins* v. *Carraway*, 59 Miss. 222. And, as the act in question did not clothe the commissioners appointed by the Governor with power to create precincts, they could not change the places for holding elections as fixed by law, and their act undertaking to do so is void. It was absolutely necessary to comply with the law in giving notice of elections at each election precinct as fixed by statute.

The act of 1918 creating the proposed county did not fix a time and place for holding the election, but this duty was vested in the commissioners, and, not having the time of the election fixed by law, the time must be fixed by the commissioners, and due notice given to the electors of the time and place for the holding of the election.

In 15 Cyc. 341, is found the following:

"A. Time and place are of the substance of every election, and as a rule it is essential to the validity of an election that it be held at the time and in the place provided by law; and if it be not so held the

eligibility of the candidates voted for will not help the matter.''

''B.  In order to make a popular election legal, there must be a time fixed in advance for holding it, either by law or by the officer or officers empowered by law to appoint the time; and, if no time be fixed in either manner, no valid election can be held.  If the time is fixed by general law, that will govern, and no election can be held at any other time except under statutes providing for special elections; and where the statute fixes the time for holding an election, there is no power to adjourn it to a subsequent day, unless the Constitution or statute, in terms authorizes such adjournment.''

In 15 Cyc., p. 320, under the head ''Proclamation or Notice'' of election, the following rule is laid down:

''A.  The object of a proclamation is to give notice to the electors that the election will be held, and this notice lies at the foundation of any public elective system, and must be given in some form in order to hold a valid election.

''B.  The time and place of holding regular elections are generally prescribed by public laws, and, when this is so, the rule is that an omission to give the prescribed statutory notice will not vitiate an election held at the time and place appointed by law.  In such case the provision for notice. is considered as directory, and not mandatory.  The time and place being appointed by law, the electors are bound to take notice of the same, and therefore derive notice from the statute itself, inasmuch as they are presumed to know the law.  The purpose of the prescribed notice is to give greater publicity to the election, but the authority to hold it comes directly from the statute; if it were otherwise, any public election might be defeated by the ignorance, carelessness, or design of the officers whose duty it is to give the notice.  And *a fortiori* a defective official notice which does not mislead the

electors or cause them to lose their votes will not vitiate a general election held under such circumstances; for, where there has been a substantial compliance with the requirements of the law in this regard, and there has been a fair election, the result cannot be defeated by mere technical irregularities. The vital and essential question in all the cases is whether the want of a statutory notice has resulted in depriving a sufficient number of electors of the opportunity to exercise their franchise to change the result of the election.

"C. When the time and place of holding the election are not fixed by law, but the election is only to be called, and the time and place to be fixed by some authority named in the statute, after the happening of some condition precedent, it is essential to the validity of such an election that it be called, and the time and place of holding it be fixed by the very agency designated by law, and by none other; and where there is no notice of such an election, either by proclamation or in fact, and it is obvious that the great body of electors were misled for want of official proclamation, its absence becomes such an irregularity as prevents an actual choice by the electors and renders invalid any semblance of an election which may have been attempted."

To the same effect see 9 R. C. L., section 13, p. 990; 10 Amer. & Eng. Enc. of Law, p. 626.

In the majority opinion it is said: "In the statement of the case counsel for appellant mention certain alleged violations of the act, but do not cite any authorities sustaining this position, nor in fact argue these questions in their brief. We therefore say, in passing that these irregularities would not vitiate the elections" —citing *Hatten* v. *Band,* 112 Miss. 590, 73 So. 612; *Shines* v. *Hamilton,* 87 Miss. 384, 39 So. 1008; *Johnson* v. *Board of Supervisors,* 113 Miss. 435, 74 So. 321; *Pradat* v. *Ramsey,* 47 Miss. 24.

I respectfully submit that these cases do not touch the proposition at issue. It is true that counsel did not argue this point elaborately, but I understand from the briefs and record that it was insisted upon. In the case of *Hatten* v. *Band,* 112 Miss. 590, 73 So. 612, the irregularity there complained of did not relate at all to the time and place for voting and notice of election. As a general rule it is true that irregularities for holding an election do not affect the validity of an election, but that does not apply to the conditions precedent to holding an election.

In the case of *Johnson* v. *Board of Supervisors, supra,* the defect complained of there was that one of the commissioners was not a freeholder, which, of course, would not affect the validity of his acts, as he was at least a *de facto* officer; but the court further held that the act of the board was strictly in compliance with the statute.

In *Shines* v. *Hamilton, supra,* the contest was over the placing of the name on the ticket, and it was held that whether the ballot was strictly legal or not would not prevent the electors from holding the election, the electors being empowered to act in such case, and that the ballots actually used were properly counted. The case, of course, is not applicable, because the time and place were properly fixed by law.

In the case of *Pradat* v. *Ramsey,* 47 Miss. 24, it was held that the entire machinery of election laws was designed to elicit an expression of the will of electors in the choice of officers; that the fundamental principle is that the election shall terminate according to the will of the majority or plurality of those qualified to vote, and, if this has been realized, that the mere omission of statutory observances prescribing the details for conducting elections will not vitiate it. If the election was held at the proper time and place, and under the supervision of competent persons, mere irregularities which concern the form will not avail to

avoid it, unless it be shown that legal votes have been rejected or illegal votes received, etc. This decision does not support the position of the majority, but supports my position, because the vital element of a valid election, according to this authority, is that the election shall be held at the proper time and place, and under the supervision of competent persons. The point here involved was not involved in that case, and the principles announced do not authorize dispensing with the essential notice to electors.

There is a marked distinction in the authorities be-between elections held at a time and place fixed by law and elections depending upon notice by posting or publication. Every person being charged with knowledge of law must, of course, be charged with notice of time and place for the holding of an election where that is fixed by law, but, where the notice is to be given, then the terms of the statute must be strictly complied with. How can it be said in this case that no prejudice resulted from holding the election at only one precinct where there were more than one precinct in the territory in which the election was to be held? For instance, if the voters lived around the community of Midnight and are required to go to a distant point to exercise the right of franchise rather than to a place fixed by law for them to vote, can we assume that all attended who desired to vote? The distance might be too far and the inconvenience too great for an elector to exercise his right. Why should the court uphold the holding of an election at only one precinct where under the law four precincts existed? Under the general law an elector cannot vote outside of his election precinct. The voter might well know he was not registered at Silver City or Belzoni, and numbers of them may have gone to their respective precincts to vote and found no managers in charge to receive their vote. How can we say that failure to hold the election at the places fixed by law did not deny the ballot to

qualified electors? It is easy to see how manipulations of the kind charged in the declaration would result in carrying or defeating a proposition submitted to the electorate. It was in practical effect submitting to the voters of Silver City alone the question so far as Yazoo county was concerned, and submitting to the voters of Belzoni alone the right to determine for the territory taken from Washington county. Suppose, for instance, the vote had been held at Lake City alone; would the people of Silver City have been satisfied? And would not the result have been entirely different? The law on elections should be complied with, and especially so where the Constitution imposes a condition of hold- ing an election, and obtaining the consent of the voters to the performance of an act. It seems to me that common fairness and good faith required the election to be held at each voting precinct, and that notice should have been given to the voters of each precinct by posting notices at such precincts for the time required by law.