708 F.2d 1523
 Bobby BATTLE, et al., a class action, Plaintiffs-Appellees,
Cross-Appellants,
United States of America, Plaintiff-Intervenor,
v.
Park ANDERSON, his successor, Richard Crisp, Warden,
Oklahoma State Penitentiary, McAlester, Oklahoma, and his
successor; J.M. Sunderland, Warden, Oklahoma State
Reformatory, Granite, Oklahoma, and his successor;
Department of Corrections, F. Warren Benton, Director, his
successor; and the current State Board of Corrections,
Frank E. Carey, Jr., President; Leroy W. Kirk, Patricia
Montgomery, Gary M. Cook, Chester T. Curtin, Seth
Millington, William Thompson, as members and their
successors, Defendants-Appellants, Cross-Appellees.
 Nos. 82-1065, 82-1379, 82-1762, 82-1884, 82-2264, 82-2325
and 82-2492.
 United States Court of Appeals,
Tenth Circuit.
 May 6, 1983.
Rehearing Denied June 6, 1983.
 
 Louis W. Bullock, Tulsa, Okl., for Bobby Battle, et al.
 Louise A. Lerner, Atty., Dept. of Justice, Washington, D.C. (Wm. Bradford Reynolds, Asst. Atty. Gen., Walter W. Barnett, Atty., Dept. of Justice, Washington, D.C., and Gary L. Richardson, U.S. Atty., Oklahoma City, Okl., with her on the brief), for United States of America.
 Robert A. Nance, Asst. Atty. Gen. of Oklahoma, Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen., and Gloyd L. McCoy, John E. Douglas, Scott J. Silverman, and Elizabeth J. Bradford, Asst. Attys. Gen., Oklahoma City, Okl., with him on the briefs), for State of Oklahoma.
 Michael Avant-Pybas, Chief Atty., Oklahoma Dept. of Corrections, Oklahoma City, Okl., for Oklahoma Dept. of Corrections.
 Before BARRETT, DOYLE and McKAY, Circuit Judges.
 ORDER
 PER CURIAM.
 
 
 1
 The decision of the district court is affirmed. The opinion of this court consists of Parts I and II of Judge Barrett's opinion, in which Judge Doyle and Judge McKay join, and the opinion of Judge McKay, in which Judge Doyle joins.
 
 
 2
 BARRETT, Circuit Judge.
 
 
 3
 These consolidated cases come to us on appeal as part of a 42 U.S.C.A. Sec. 1983 action initially filed by Bobby Battle (Battle), appearing pro se, in 1972. Before Battle's complaint challenging conditions of confinement was heard, a disastrous riot occurred at the Oklahoma State Penitentiary located at McAlester. In Battle v. Anderson, 564 F.2d 388 (10th Cir.1977) we quoted the district court relative to the conditions then prevailing:
 
 
 4
 The conditions which precipitated and caused the disastrous riot of 1973 at McAlester now prevail throughout the system. In the hearings ... the court heard the shocking details of the conditions existing prior to the riot and became convinced that the neglect, apathy and deliberate disregard for human decency and rights contributed directly to the tragic loss of lives and $20 million in state property damages. It is now equally clear that the inmate conditions now existing present an immediate and intolerable threat to the safety and security of the inmates, prison personnel and the people of the State of Oklahoma ....
 
 
 5
 564 F.2d at p. 393.
 
 
 6
 The deteriorated condition of the penal facilities, coupled with a serious problem of overcrowding, was found to constitute cruel and unusual punishment under the Eighth Amendment of the United States Constitution. This court affirmed that finding on appeal. Thereafter, the district court pursued a number of compliance hearings in order to assure that the Oklahoma penal institutions would meet constitutional muster. These hearings involved testimony from various penal experts. It was generally conceded by all parties that the overall conditions existing in 1973 were unconstitutional and intolerable. Not only were the prison facilities overcrowded, but these facilities were decadent, filthy, and without proper plumbing or ventilation. Inmates were found to be without meaningful recreation, religious freedom, and access to the courts. The institutions were understaffed and ill-staffed. Prisoners were found to be without adequate medical care.
 
 
 7
 On May 4, 1979, the State of Oklahoma, through its highest elective and appointive officials, presented to the district court a detailed plan which involved the construction of new penal facilities, modern in design and well equipped. Further, the plan provided for well trained correctional personnel and many additional professionals. Those inmates occupying single cells were to be accorded not less than 60 square feet and those housed in dormitories were to be afforded not less than 75 square feet. Once the State's plan was approved by the district court, the court appointed its fact finder to oversee or audit the degree of progress and compliance with stipulated standards. Tremendous progress has been made by the State of Oklahoma as will be more specifically described hereafter. Suffice to say, the Governor and the State Legislature responded to the crisis with dispatch and outstanding leadership. However, even with the new institutions, and their increased capacity, the tremendous increase in the incidence of crime has resulted in a prison population much in excess of that envisioned under the State's plan. This condition required the State to apply to the district court for authority to double cell the inmates.
 
 
 8
 For convenience, hereafter plaintiffs below, Bobby Battle, et al, will be referred to as Battle and defendants below, Park Anderson, et al, will be referred to as State of Oklahoma or State.
 
 I.
 Nos. 82-1065 and 82-1379
 
 9
 These consolidated appeals challenge certain findings and conclusions in the district court's order of January 12, 1982 (No. 82-1065) as supplemented on January 27, 1982 (No. 82-1379). The relevant undisputed facts will be summarized.
 
 
 10
 On December 1, 1981, the Oklahoma Department of Corrections (Department), by formal Department resolution, declared that an emergency existed in respect to the housing of inmates within Oklahoma's penal institutions. Within this resolution, the Department requested the Oklahoma Attorney General to petition the district court for modification of existing orders precluding double celling and for permission to temporarily permit double celling in 310 units at four Oklahoma prisons.
 
 
 11
 On December 9, 1981, in accordance with the Department's request, the Oklahoma Attorney General moved for immediate Board authority to temporarily double cell "not more than two inmates in not more than 310 cells" located in four Oklahoma prisons, to-wit: Joseph Harp Correctional Center, Lexington Assessment and Reception Center, Conner Correctional Center and Mabel Bassett Correctional Center. This motion was heard on December 22 and 23, 1981.
 
 
 12
 During the course of the December 23, 1981, hearing, the district court ruled that the State of Oklahoma would be fined $1,000 for each day that inmates were double celled in Oklahoma prisons. Additional hearings on the motion were conducted on December 31, 1981 and January 8, 1982. During the course of the January 8, 1982 hearing, the district court withdrew the $1,000 daily fine for double celling.
 
 
 13
 On January 12, 1982, the district court entered an order permitting double celling in accordance with the Oklahoma Attorney General's motion at the four specified prisons. In so doing, however, the district court found, inter alia: the conditions under which double celling will be effectuated in Oklahoma differ significantly from the conditions which existed in Ohio at the time the Supreme Court of the United States upheld double celling in Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); and, the conditions in the four Oklahoma penal institutions utilizing double celling "will be unconstitutional for a temporary period of time, until double celling is no longer used". On January 27, 1982, the district court supplemented its January 12, 1982 order with additional specific findings relative to incarceration in Oklahoma's penal institutions, sua sponte, following an order of this court striking the district court's finding of unconstitutionality by virtue of double celling, per se.
 
 
 14
 On April 6, 1982, the Oklahoma Attorney General filed a motion seeking immediate and permanent relief from the prohibitions against double celling throughout the Oklahoma penal system then housing inmates. On April 23, 1982, the district court ordered:
 
 
 15
 1. The Court finds and holds that the Defendants should have and do hereby have the authority indefinitely but not permanently to double-cell where necessary. This Court's Order of January 12, 1982, is hereby vacated in part to permit indefinite double-celling throughout the Oklahoma Department of Corrections consistent with constitutional requirements.
 
 
 16
 It is to be observed that the district court's April 23, 1982, order authorized double celling not only at the initially approved four (4) penal institutions, but throughout the entire Oklahoma penal system on an "indefinite" basis providing that constitutional requirements are met.
 
 
 17
 On appeal the State of Oklahoma contends: (1) the district court's conclusion that double celling at four of Oklahoma's correctional institutions would be unconstitutional is contrary to law and Rhodes v. Chapman, supra; (2) the district court's finding that the four Oklahoma facilities at which the Department sought to double cell represented a different situation than that presented in Rhodes v. Chapman, supra, is clearly erroneous; (3) the $1,000 daily fine imposed by the district court was not a proper exercise of the court's equitable remedial power; and (4) the district court has been too intrusive into the legitimate state activity of prison management. We hold that the State of Oklahoma's appeals must be dismissed as moot. All of the issues presented, however, are addressed in Part III of this opinion, except (3).
 
 
 18
 28 U.S.C.A. Sec. 1291 provides for appeal only "from the final decisions of the district courts," except where direct appeal to the Supreme Court is provided. United States v. Feeney, 641 F.2d 821 (10th Cir.1981). This requirement promotes judicial efficiency and enhances a strong congressional policy against piecemeal reviews and against obstructing or impeding ongoing judicial proceedings. United States v. MacDonald, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978); United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The courts have the responsibility of determining whether an order is final and therefore appealable. Century Laminating, Ltd. v. Montgomery, 595 F.2d 563 (10th Cir.1979), cert. dismissed, 444 U.S. 987, 100 S.Ct. 516, 62 L.Ed.2d 417 (1979).
 
 
 19
 An appellate court has, of necessity, the discretion to dismiss an appeal when a particular controversy has expired. Security Bancorp v. Board of Governors, etc., 655 F.2d 164 (9th Cir.1981). No appeal is necessary from an order which has been vacated. Theodoropoulos v. Thompson-Starrett Company, 418 F.2d 350 (2d Cir.1969), cert. denied, 398 U.S. 905, 90 S.Ct. 1697, 26 L.Ed.2d 65 (1970). An appeal from a prior order later vacated by the district court must be dismissed as moot. Federal Home Loan Bank Board v. Long Beach Savings & Loan Association, 295 F.2d 403 (9th Cir.1961).
 
 
 20
 An election to undertake a review of the State of Oklahoma's allegations of error at this juncture would be in direct contravention of Wiley v. National Collegiate Athletic Association, 612 F.2d 473 (10th Cir.1979), cert. denied, 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980). We there stated:
 
 
 21
 Mootness, like ripeness and standing, has its constitutional origin in the "case or controversy" limitation of Article III which insures that courts exercise their power only in cases where true adversary context allows informed judicial resolution. Liner v. Jafco, Inc., 375 U.S. 301, 306 n. 3, 84 S.Ct. 391 [394 n. 3], 11 L.Ed.2d 347 (1964); Napier v. Gertrude, 542 F.2d 825, 828 (10th Cir.1976), cert. denied, 429 U.S. 1049, 97 S.Ct. 759, 50 L.Ed.2d 765 (1977). The actual controversy between the parties "must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973).
 
 
 22
 612 F.2d at p. 475.
 
 
 23
 Applying these standards to the facts herein, we hold that the State of Oklahoma's appeal in these consolidated cases must be dismissed as moot. The district court's order of April 23, 1982 vacated its January 12, 1982 order and afforded the State of Oklahoma the authority to double cell, as necessary, indefinitely throughout the entire Oklahoma penal system. Thus, the State of Oklahoma's allegations of error presented herein are no longer viable. They are, accordingly, moot.II.
 
 No. 82-1884
 
 24
 In this cross-appeal brought by the Department we are asked to determine the right of the Department to be represented by counsel of its choice inasmuch as the Department's views are not in accord with those of the Oklahoma Attorney General.
 
 
 25
 On April 16, 1982, in case No. 80-1065, this court entered an order partially remanding that case to the district court for the purpose of specific determinations:
 
 
 26
 For determination as to whether the Attorney General of the State of Oklahoma or the Chief Attorney for the Oklahoma Department of Corrections represents the appellants. If both have authority, who is entitled to prevail if their positions are contradictory.
 
 
 27
 On April 22, 1982, the Oklahoma House of Representatives passed House Resolution No. 1035 which provided:
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 WHEREAS, the State has been involved in lengthy litigation in the federal courts of the issue of double celling....
 
 
 31
 WHEREAS, up to the present time the Attorney General, as the Chief Law Officer of the State, has represented the Department of Corrections in such litigation in the federal courts; and
 
 
 32
 WHEREAS, it is the intent of the House of Representatives that the Attorney General continue to represent the Department of Corrections and the State in the federal courts in the case of Battle v. Anderson, which pertains to the rights of inmates in state correctional facilities; and
 
 
 33
 * * *
 
 
 34
 * * *
 
 NOW, THEREFORE, BE IT RESOLVED ...:
 
 35
 Section 1. The House of Representatives hereby requests that the Attorney General continue to represent the Department of Corrections and the State in the litigation of the case of Battle v. Anderson currently before the Tenth Circuit Court of Appeals, Docket Number 82-1065.
 
 
 36
 * * *
 
 
 37
 * * *
 
 
 38
 On May 20, 1982, the district court entered an order finding, inter alia, that: the Attorney General of Oklahoma represents the defendants and has done so for the past ten years; the Department of Corrections has an Oklahoma constitutional right to have counsel represent its interests; and that "[i]n the event the chief attorney for the Oklahoma Department of Corrections chooses to adopt a position contradictory to that of the Attorney General, as a matter of state law, the court finds that the Attorney General's position must prevail."
 
 
 39
 On appeal the Department contends: (1) the Oklahoma Attorney General does not, as a matter of state law, possess the authority to seek relief contrary to the lawful requests of his clients nor to exercise complete dominion and control over the Battle litigation; (2) the Attorney General must follow the code of professional responsibility and recognized ethical standards in the attorney-client relationship with the defendants; and (3) officials who have been sued and are subject to comprehensive remedial orders have a constitutional right to be heard in the federal courts under the due process clause of the Fifth Amendment.
 
 
 40
 We hold that the district court did not err in finding that the Oklahoma Attorney General represents the defendants herein, including the Oklahoma Department of Corrections, and that the Oklahoma Attorney General's opinion must prevail in the event of a conflict with counsel for the Department. We believe that our holding is in accord with the laws of Oklahoma, particularly, 74 Okl.St.Ann. Sec. 18b, which provides:
 
 
 41
 The duties of the Attorney General as the chief law officer of the State shall be:
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 (b) To appear for the State and prosecute and defend all actions and proceedings in any of the federal courts in which the State is interested as a party.
 
 
 45
 (c) To appear at the request of the Governor, the Legislature, or either branch thereof, and prosecute and defend in any court or before any commission, board, or officers any cause or proceeding, civil or criminal, in which the State may be a party or interested; and when so appearing in any such cause or proceeding, he may, if he deems it advisable and to the best interest of the State, take and assume control of the prosecution or defense of the State's interest therein. [Emphasis supplied].
 
 
 46
 The statutory position of the Oklahoma Attorney General has been amplified in numerous Oklahoma court decisions. In State ex rel. Derryberry v. Kerr-McGee Corporation, 516 P.2d 813 (Okl.1973) the court held:
 
 
 47
 The Attorney General, by statute, 74 O.S.1971 Sec. 18 is the Chief Law Officer of the State. In the absence of explicit legislative or constitutional expression to the contrary, he possesses complete dominion over every litigation in which he properly appears in the interest of the State, whether or not there is a relator or some nominal party. State ex rel. Nesbitt v. District Court of Mayes County, 440 P.2d 700, 707 (Okl.1967).
 
 
 48
 The Attorney General has authority to bring law suits by virtue of 74 O.S.1971 Sec. 18b and to assume and control the prosecution thereof in the state's best interest. It must logically follow that he has authority to compromise and dismiss the suit.
 
 
 49
 * * *
 
 
 50
 * * *
 
 
 51
 As an incident to the dominion the Attorney General possesses over every suit instituted in his official capacity, he has the power to dismiss, abandon, discontinue, or compromise suits brought by him either with or without a stipulation by the other party and to make any disposition of such suits as he deems best for the interest of the state. Lyle v. Luna, 65 N.M. 429, 338 P.2d 1060, 1065 (1959) (dealing with constitutional provision similar to Art. 5, Sec. 53). See also State v. Jones, 252 Ala. 479, 41 So.2d 280, 284 (1949). State v. Finch, 128 Kan. 665, 280 P. 910, 913, 66 A.L.R. 1369 (1929).
 
 
 52
 516 P.2d at p. 818.
 
 
 53
 We view the observations in Wade v. Mississippi Cooperative Extension Service, 392 F.Supp. 229 (N.D.Miss.1975), interpretive of the authority of the Attorney General of Mississippi, as relevant here:
 
 
 54
 We emphasize that this case does not concern the authority which the Board may legally exercise in employing counsel in the discharge of many activities, which may be of a purely local, administrative, or proprietary nature. For example, the Board may need legal assistance in purchasing real estate, collecting debts from others, preparing and reviewing employment contracts with professional staff, and other matters similarly related to the Board's ordinary functions. Whether the Board may engage counsel, independently of the Attorney General's office, to assist in matters of this kind is not presented by this case, and we express no opinion thereon.
 
 
 55
 But in actions of indisputable statewide interest, where the Attorney General is specifically empowered to act for state agencies by long-established constitutional doctrine, due regard for Mississippi's Constitution by applying the familiar rule of pari materia interpretation mandates that the Board not be allowed to usurp his constitutional prerogative. See St. Louis & San Francisco R. Co. v. Benton County, 132 Miss. 325, 96 So. 689 (Miss.1923); State v. Jackson [119 Miss. 727, 81 So. 1], supra.
 
 
 56
 392 F.Supp. at p. 235.
 
 
 57
 In affirming the district court's finding that the Oklahoma Attorney General represents the defendants herein and that his views must prevail when a conflict with Department's counsel surfaces, we reject the Department's argument that such a holding is contrary to State ex rel. Howard v. Oklahoma Corporation Commission, 614 P.2d 45 (Okl.1980).
 
 
 58
 Howard is distinguishable in several significant respects. Howard involved a mandamus proceeding in which the Oklahoma Supreme Court exercised its original jurisdiction to consider whether the Oklahoma Corporate Commission could be represented by its own counsel in an action wherein realtors sought to require the Commission to comply with certain statutory provisions which the Attorney General of Oklahoma had, in a formal opinion, declared unconstitutional. In allowing the Commission to be represented by counsel of its choice, the court specifically acknowledged its right and duty to assume original jurisdiction and its "considerable authority over the appearance of counsel, and related matters, implicit from its constitutional grants of authority...." The Howard court did acknowledge the Commission's right to be represented by counsel whose views were consonant with its own or who would at least present its interests. However, the court did so within the confines of an original jurisdiction proceeding involving an action to assess the validity of an attorney general's opinion which negated an act of the legislative branch. Such is not the case before us here. In the case at bar, both the Oklahoma Legislature and the Department of Corrections have specifically requested, on numerous occasions, the legal assistance of and representation by the Attorney General. We hold that the district court did not err in finding that the Oklahoma Attorney General represents the defendants and that his position must prevail whenever a conflict arises between the Attorney General and counsel for the Department.
 
 III.
 Nos. 82-1762, 82-2264, 82-2325 and 82-2492
 
 59
 The questions for our determination in these consolidated appeals are: (1) Did the district court err and exceed its jurisdiction by its order granting the State of Oklahoma "indefinite" relief from the prohibition of double celling, rather than the "permanent" relief requested by the State of Oklahoma; (2) did the district court exceed its jurisdiction by its order of October 12, 1982, requiring the State of Oklahoma, not later than May 1, 1983, to file a detailed plan whereby the State of Oklahoma would return to single celling and the space limitations stipulated to in January, 1981; (3) did the district court err in placing the burden of proof on Battle, et al., to show that conditions in the Oklahoma prison system are unconstitutional; and (4) did the district court err in denying Battle's request that a "cap" be placed upon the population growth in the Oklahoma prison system.
 
 
 60
 At an October 31, 1981 hearing the district court described double celling as a "terrible" evil in the same category as "overcrowding" in the whole Oklahoma penal system. [R., Supp.Vol. II, pp. 9-10]. The court did not accept the State's contention that the portion of Oklahoma's penal system then housing inmates met the standards of the Ohio penal facility, which was the subject of Rhodes v. Chapman, supra. The State requested that the court remove the $1,000 per day sanction imposed for every day that double celling occurred or until Oklahoma presented a plan with a solution to the end of double celling. The court's special concern with overcrowding was that it led to possible violence and personal encounters, degradation, and a "failure" of sanitation, medical attention, security, food and clothing, and proper housing. [R., Supp.Vol. IV, pp. 14-15]. The court advised the State to have a "remedy" to the problem of "increased populations" at the State's penal institutions come January and February, 1982. [R., Supp.Vol. IV, p. 17]. The court stated that the $1,000 per day fine imposed upon the State for double celling was the result of "their dereliction and negligence in the past." [R., Supp.Vol. IV, p. 24]. The court made it clear that the measure of constitutional compliance was that of meeting American Correctional Association (ACA) standards. [R., Supp.Vol. IV, p. 277].
 
 
 61
 At a compliance hearing held on December 22, 1981, Governor Nigh, among many others, testified. He stated, inter alia: In 1975 the Department of Corrections had 1,214 full time employees (the disastrous riot at McAlester occurred in 1973, resulting in tragic loss of lives and some $20 million in property damage), and today that number is 2,802, including specialized employees at the mental health institution and Western State; the Oklahoma Correctional System is the first major correctional system to be fully accredited by the ACA; as Governor, he has set a goal to have every Oklahoma penal institution fully accredited; in 1975 the operational budget of the Department was $11,961,000, and that same year capital outlay was $4,341,000; including the appropriations recommended by the Governor for 1983, coupled with 1982 appropriations, the State had expended, for operations alone, the sum of $338,782,922 since 1975; in 1975 the operational budget was $11,961,000 and in 1983 the operational budget will exceed $70,000,000; since 1975, capital outlays have amounted to $91,706,982; from 1975 to 1983, the operational budget has increased 565%; the State has made tremendous strides with great response from the Legislature; the tremendous increase in crimes has placed the State's prison population as estimated under the State's plan much out of kilter, creating a "different situation". [R., Supp.Vol. III, pp. 27-29].
 
 
 62
 In 1982, some 304 replacement beds became available in the newly constructed inmate housing area at the Oklahoma State Penitentiary at McAlester. In addition, extensive renovation, in accordance with the district court's orders, will likely be completed in Cellhouse F of the McAlester facility in November, 1983. A new housing unit was added in 1978 to the McLeod Correctional Center at Farris, Oklahoma, originally intended to house 91 inmates, of whom 86 were to occupy general population cells and 5 to occupy disciplinary cells. New housing units at the Ouachita Correctional Center as of 1982 house approximately 178 inmates. In 1980 the new Jess Dunn Correctional Center was opened at Taft, Oklahoma, with a design capacity of 305 inmates. The James Crabtree Correctional Center at Helena, Oklahoma, is being renovated and by 1984 should house some 300 inmates. The women's prison at Mabel Bassett Correctional Center in Oklahoma City, opened in 1973 with a designed capacity of 110, has additional new housing units of 65 completed in 1982 and an additional 65-cell housing unit is expected to be completed in May, 1983. The Joseph Harp Correctional Center at Lexington was opened in 1978 with a designed capacity of 414 cells and some additional 80 cells are expected to be completed by August, 1983. The Lexington Correctional Center was also opened in 1978 with a two-part design capacity of some 430 cells, and about 180 additional cell units are expected to be completed in July of 1983. The Conner Correctional Center at Hominy, Oklahoma, was opened in 1979, with a design capacity of 430 cells. An additional 80 cells are expected to be completed in August, 1983.
 
 
 63
 The problem of prison overcrowding surfaced again in Oklahoma at least as early as 1979, the result of the sharp increase in the incidence of crime and criminal convictions. The situation dictated that certain convicts be retained in Oklahoma's county jails because the State's penal system was overcrowded. The district court found that the Oklahoma Legislature enacted resolutions to require the removal of the convicted prisoners from the overcrowded county jails into the overcrowded state penal system and that these resolutions "afforded no directions nor methods to depopulate or otherwise solve the overcrowding problem, but rather burdened the Oklahoma Department of Corrections with solving the problem, without extra authority and money. This was a shabby way to treat the Department of Corrections and the members of the Board of Corrections." [Emphasis supplied]. [R., Supp.Vol. I, Findings and Order of January 12, 1982, p. 68]. The court proceeded to find that because of this "shabby" treatment, the Department was placed in the untenable position of requesting the Oklahoma Attorney General to petition the district court for permission to double cell. The court did not find Rhodes v. Chapman, supra, controlling. The court reluctantly modified its order of May 4, 1979, and other orders which had limited one prisoner to a cell after finding that the conditions (double celling) at the four penal institutions "will be unconstitutional for a temporary period of time." The Department was authorized to double cell in not more than 310 cells in the four institutions until December 22, 1982, unless further extended by the court. [R., Supp.Vol. I, p. 70].
 
 
 64
 On January 21, 1982, Battle and United States moved for further evidentiary hearing on the issue of the court's orders of 1977, 1978 and 1979 regarding overcrowding. The court, following a pretrial conference on February 5, 1982, scheduled a submission of information on the overcrowding issue to be filed by the parties not later than March 1, 1982. Various depositions were filed, together with photographic exhibits. Evidentiary hearings were held on March 8 and 9, 1982, and culminated with a detailed hearing held on Battle's "Motion to Vacate or Order Stay of Implementation" of the trial court's prior order authorizing double celling and request that the court place a cap on the number of prisoners who can be incarcerated within the Oklahoma prison system. The court had before it a report from the district court's selected Finder of Facts, Mr. John Albach and a letter-report from Mr. Larry Meachum, Director of the Department of Corrections.
 
 
 65
 On October 4, 1982, the district court conducted a detailed hearing. The court stated that it considered this case as one of equity whereby the court was required to do what is "right" between the parties in the area of operation of the Oklahoma penal system within constitutional limits. [R., Vol. II, p. 3]. The court, of course, noted that the Oklahoma penal system was overcrowded. The court observed that the Legislature has appropriated thousands of dollars and "I want to hear this morning evidence showing a non-compliance with constitutional requirements if there are any and whatever they are." [R., Vol. II, p. 4].
 
 
 66
 The court found from the evidence that, with respect to those facilities within Oklahoma's penal system housing inmates, there exists no: improper clothing, improper bedding, improper coldness, improper food, improper hygiene, improper medication, improper medical care, or improper segregation. The court stated that there had been some periodical reports of some improper segregation and some question about improper access to the court. There were no findings in that regard, however. Our review of the record leads us to observe, as the trial court found, that the physical facilities used to house inmates are excellent. The detailed photographic exhibits evidence this.
 
 
 67
 They are, in my review, so modern, so spacious and so extensive as to be not only fit but most comfortable for prisoners. The facilities in use are new, light, modern and accommodating. The recreational facilities are extensive, modern and spruce; the dormitories are new, clean and comfortable; library facilities are modern, complete and convenient; washing, bathing and toilet facilities are modern, clean and spacious; kitchens are modern, well equipped and clean; dining facilities are new, attractive and comfortable; medical and dental facilities are extensive, modern and well equipped; training shops are modern and well equipped; classrooms are modern, clean and comfortable; chapels are modern, beautiful and convenient; barber shop facilities are extremely modern, well equipped and comfortable. Personal property and equipment is new, and attractive. All in all, these correctional facilities being used to house inmates are anything but penal in a punishment sense. The State of Oklahoma has, in my view, traveled that "extra mile" to provide its prisoners with every chance and opportunity to rehabilitate their lives. Their facilities and surroundings are outstanding. The trial court said it well: "The Court finds from the record ... that the State of Oklahoma has appropriated substantial sums of money for the operation of the prisons and appropriated substantial sums of money (approximately $93 million) to build new prisons, but the crime rate in the State of Oklahoma has grown so fast that the building of new prison cells or prison buildings ... to take care of one man, one cell, it has just been impossible to do." [Emphasis supplied]. [R., Vol. II, p. 6]. The trial court further observed that the growing prison population is a direct result of more crimes, more trials and more convictions, which has created the need for double celling.
 
 
 68
 Mr. Bullock, counsel for Battle, viewed the present prison system in Oklahoma as one in such a deteriorating state that it is a "system in crisis". [R., Vol. II, p. 13]. He contended that his clients (the incarcerated prisoners) should not have to wait until the court's conscience is again shocked by the
 
 
 69
 "way human beings are being treated in the Oklahoma Prison System. We have a right in equity to have past harms avoided in the future. We shouldn't be made to sit and subject ourselves to repetition of conditions that we've seen before and wait until that date for this court to intercept the deterioration."
 
 
 70
 [R., Vol. II, p. 13]. It was on that premise that Battle, et al., opposed double celling and urged the court, if necessary, to "put a lock on the door to allow no more increases in this population until specific units are brought on line to fully acquaint us with all the problems of this system." [R., Vol. II, p. 14]. While the trial court did not accept Battle's contentions that double celling should cease on constitutional grounds and that a "cap" should be placed on the number of prisoners to be incarcerated in the Oklahoma Prison System, the court was nevertheless convinced that the situation with regard to overcrowding did place the system in the "twilight" of constitutional compliance. This observation was, of course, predicated on increased prison population. It is my view that increased prison population, in and of itself, should not place Oklahoma's prison system in a "twilight" zone of constitutional compliance except when measured against the trial court's initial order requiring one man per cell with a minimum of 60 square feet per cell and those housed in dormitories to be afforded not less than 75 square feet. This is the only basis on which the court could have predicated its "twilight" observation, simply because there do not now exist any unconstitutional conditions in the Oklahoma Prison System. The trial court so found.
 
 
 71
 Counsel for Battle contends that the trial court erred by casting the burden on the plaintiffs to demonstrate the existence of unconstitutional conditions within the Oklahoma Prison System. To do so, said Mr. Bullock, would render the victory the plaintiffs have fought so hard to win a "hollow one". The burden, as Mr. Bullock sees it, is that of the State of Oklahoma to recognize that the system is already deteriorating and that action is required now to assure that the "plan" adopted by the State of Oklahoma to upgrade the system following the 1973 riot, based upon the totality of adverse conditions prevailing in the system, must, at all times, without excuse, be abided. In order to enforce this obligation, counsel for Battle insists that it is the duty of the State of Oklahoma to expeditiously appropriate all necessary funds and proceed on an emergency basis to construct new prison facilities to accommodate the prisoners, regardless of costs and adverse impact on other State obligations.
 
 
 72
 In the course of the April 23, 1982, evidentiary hearing, the State of Oklahoma submitted an affidavit of Superintendent Ronald C. Marshall of the Southern Ohio Correctional Facility at Lucasville, Ohio, which was admitted. Superintendent Marshall is chief administrator of the Ohio correctional facility which was the subject of Rhodes v. Chapman, supra, which, for convenience shall hereafter be simply referred to as Rhodes. He testified that he had personally examined the Oklahoma correctional facilities in use, and, without exception, found that those facilities met or exceeded the standards of his Ohio institution, which, of course, is the prison facility wherein the Supreme Court approved double celling. Superintendent Marshall stated that: inmates in the Oklahoma institutions had as much freedom outside of their cells as did the prisoners at his facility; the Oklahoma inmates had more freedom to pass in and out of their cells than inmates at his facility; the Oklahoma facilities were freer of pests and vermin compared to his facility; the size of the cells in the Oklahoma facilities equalled those at his facility, approved by the Supreme Court in Rhodes; the recreational facilities, chapels, medical facilities, commissary or canteen facilities, and industrial or job training opportunities, equalled or exceeded those existing in his institution when double celling was approved in Rhodes. In detailed account, Superintendent Marshall further testified in open court at the April 23, 1982, hearing. In summary, he found the Oklahoma facilities housing inmates and their operation were very adequate, well managed and well staffed.
 
 
 73
 It is on this note that I now turn my attention to the extent that Rhodes controls the disposition of this appeal. I have carefully reviewed that opinion, keeping in mind that the evidence in this record demonstrates, beyond dispute, that the Oklahoma correctional facilities housing inmates, the subject of this case, equal or exceed the Ohio penal facility which was the subject of Rhodes, in physical structure, equipment, utilities, and staff personnel. Superintendent Marshall's testimony lends credence to the proposition that Oklahoma's facilities excel the Ohio facility.
 
 
 74
 The plaintiffs in Rhodes were double celled, and the genesis of their Sec. 1983 suit, alleging a violation of the Eighth Amendment, was the overcrowded condition of the facility, a maximum security prison. They sought injunctive relief for non-temporary double celling. The district court found the institution, constructed in the early 1970's, to be first class. The conditions, physical and staff-wise, were comparable but certainly not better than those at the Oklahoma correctional facilities involved in the instant case. The Ohio institution had 1,620 cells averaging 63 square feet of floor space. Only about 350 of the cells were single occupancy at the time of trial, while approximately 1,270 were double celled. The prison held 2,300 prisoners, placing the facility at 138% of capacity. About 75% of the inmates spent a considerable time beyond their cells. The district court found only medical care and dental care to be inadequate, but by no means unconstitutional. The district court, within this context, analyzed the Eighth Amendment challenge, first applying a "totality of conditions" approach and thereafter the "shock the conscience" of the court test. This analysis led the district court to find that the conditions at the Ohio facility did constitute cruel and unusual punishment prohibited by the Eighth Amendment. The district court relied, as did the district court in Battle, upon a variety of expert correctional standards in so finding, particularly: (a) the facility was confining some 38% more inmates than it was designed for; (b) the cells were designed for single occupancy, (c) most of the inmates spent more time in their cells with cellmates than outside, and (d) the practice of double celling was not temporary. On appeal, the Court of Appeals for the Sixth Circuit affirmed, upholding the district court's application of the "totality of the conditions" approach, Chapman v. Rhodes, 624 F.2d 1099 (6th Cir.1980). The Supreme Court granted the State of Ohio's petition for certiorari.
 
 
 75
 The Supreme Court in its Rhodes opinion recognized the diverse standards applied by lower courts in determining the existence of Eighth Amendment cruel and unusual punishment involved in prison overcrowding cases. Justice Powell, writing for the majority (Justice Powell was joined by Chief Justice Burger, and Justices Stewart, White and Rehnquist) attempted, in my view, to state clear principles to be followed in evaluating Eighth Amendment contentions involved in conditions of penal confinement. Justice Powell reviewed the evaluation of Eighth Amendment applications commencing with the prohibition against barbarous penal punishment and continuing to the modern, broad interpretations which reach non-physical punishment. Justice Powell, for the majority, cited Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deprivation of contemporary standards of decency, there involving deliberate indifference to inmates' serious medical needs) and Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (totality of conditions approach, there specifically involving conditions of solitary confinement) and stated that prison conditions can be viewed alone or in combination when evaluating cruel and unusual punishment claims. Thus, the majority did recognize the validity of a "totality of the conditions of confinement" approach to cruel and unusual punishment issues. However, and most significantly here, Justice Powell, for the majority, held that the conditions creating cruel and unusual punishment must meet the measure of one of these three queries: (a) is the punishment "grossly disproportionate to the severity of the crime" warranting punishment, (b) do the conditions involve "the wanton and unnecessary infliction of pain", or (c) do the conditions deprive "inmates of the minimal civilized measures of life's necessities." 452 U.S. at p. 347, 101 S.Ct. at 2399. My analysis of Rhodes corresponds with that set forth in Smith v. Fairman, 32 Cr.L. 2084 (7th Cir., 10/5/82) which reversed a district court's finding of cruel and unusual punishment in double-celling at the Illinois Pontiac maximum security penitentiary.
 
 
 76
 The majority in Rhodes held that the five bases relied upon by the district court were insufficient to prove an Eighth Amendment violation. The majority specifically observed that the record did not evidence conditions proving that unnecessary or wanton pain was inflicted on the Ohio inmates or that the punishment was disproportionate to the crimes committed. It is significant, I believe, that the Court placed less weight on the opinions of experts and standards promulgated by correctional agencies than upon the public attitude. In dictum, this emphasis was explained. The Rhodes majority observed that harsh or restrictive conditions of confinement are part of the punishment criminal offenders justly receive because the Constitution does not mandate comfortable prisons. Justice Powell wrote that "To the extent that such conditions [of confinement] are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." 452 U.S. at p. 347, 101 S.Ct. at 2399. The majority did recognize, of course, that where old, deteriorated, deplorable facilities with attendant sordid conditions of existence prevail, federal courts should scrutinize Eighth Amendment contentions. That, we suggest, is precisely the scenario which confronted the conscientious trial judge in the initial Battle litigation following the disastrous riot of 1973. Such is not the case now.
 
 
 77
 Justice Brennan, joined in his concurring opinion by Justices Blackmun and Stevens, agreed with the majority's first test of Eighth Amendment violations, i.e., an evaluation of the totality of the conditions upon the prisoners. Justice Brennan departed from the majority in the application of the second test. In lieu, he would inquire whether the conditions comport with human dignity based on contemporary standards, predicated primarily on the evidence adduced from various experts. Even so, Justice Brennan, while acknowledging that prison overcrowding and double celling may sometimes result in serious harm to prisoners, nevertheless stated that the record relative to the Ohio facility did not establish cruel and unusual punishment aspects of confinement.
 
 
 78
 Mr. Justice Marshall, the lone dissenter in Rhodes, would require a standard much akin to that urged by Mr. Bullock, counsel for Battle. He would require, under a totality of conditions test, that penal facilities meet the measure of norms of decency recognizing the dignity of man, measured by correctional standards and expert testimony. He did not favor double celling, observing that the voters and the Ohio Legislature had not approved double celling and in fact had constructed the Ohio facility for single celling only.
 
 
 79
 Thus, a clear majority in Rhodes came down with applicable standards substantially designed to weigh the conditions of confinement against the backdrop that those criminally convicted and incarcerated are in fact imprisoned to be punished and that only that punishment "grossly disproportionate to the severity of the crime", coupled with other considered criteria, may meet the Eighth Amendment measure.
 
 
 80
 Perhaps more pertinent here, the Rhodes majority observed that state legislatures and state prison officials can properly weigh considerations affecting the adequacy of prisons because they are sensitive to the dictates of the Constitution, the problem involving just punishment, deterrence of future crime, and the promotion of rehabilitation. On this predicate, the Court cautioned lower federal courts to avoid over-zealous design in granting relief to prisoners. The Rhodes opinion, in my view, is a clear signal that the federal judiciary should, absent inaction by state courts, legislatures and executive officials where dire circumstances exist, such as those found in the Oklahoma penal system in 1972-1973, practice a hands-off policy.
 
 
 81
 The district court has retained jurisdiction under its general power to do equity, founded in its reliance on the need to continually "audit" the injunctive relief ordered. The propriety of continuing jurisdiction is anchored to the holding set forth in United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Grant was an antitrust case. The Court held that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case unless the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated.
 
 
 82
 In my view, the dictates of Rhodes, cautioning lower federal courts to pursue a "hands off" policy relative to Eighth Amendment claims involving state prisons, apply, unless the circumstances are such that the State of Oklahoma, through its executive, legislative and judicial branches permits Eighth Amendment violations to persist in the Oklahoma penal system. This would be the only need for federal court intervention and continuing supervision pursuant to the equitable power of the district court recognized in United States v. W.T. Grant Co., supra.
 
 
 83
 We recognize, for the benefit of counsel, that briefing in Case No. 82-2325 has been permitted, to some extent, by our prior orders. We further observe that the cross-appeal by the Department to Battle's appeal in Case No. 82-2492 has not yet been briefed. The court has been adequately informed of the merits of the issues there presented and has heretofore effectively decided them. Thus no further briefing is necessary.
 
 
 84
 In light of the non-existence of constitutional deficiencies in the Eighth Amendment "cruel and unusual" context presently within the Oklahoma penal system, I would hold that the conscientious district court erred in retaining jurisdiction in this case by ordering the State of Oklahoma to file an official statement of penal policy and a detailed plan of action not later than May 1, 1983, describing those measures designed to avoid the return to the Oklahoma prison system of unconstitutional conditions, and to demonstrate those steps to be taken whereby the State would return to single celling and space limitations stipulated to in January, 1981.
 
 
 85
 McKAY, Circuit Judge, with whom WILLIAM E. DOYLE, Circuit Judge, joins:
 
 
 86
 We concur in parts I and II of Judge Barrett's opinion. We write separately to state our disagreement with his resolution of an issue encountered in part III, the question of the district court's continuing authority to prevent a recurrence of the shocking, inhumane, and unconstitutional conditions that previously prevailed in the Oklahoma prisons.[1]
 
 
 87
 * In recent years, state indifference and inaction has forced the federal courts to intervene in the operation of state prison systems and engage in broad scale reform to remedy unconstitutional conditions. See Rhodes v. Chapman, 452 U.S. 337, 353-61, 101 S.Ct. 2392, 2402-2407, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring) (describing attempts by the federal courts to correct eighth amendment violations). See generally, Note, Complex Enforcement: Unconstitutional Prison Conditions, 94 Harv.L.Rev. 626 (1981). In some cases, the courts have perhaps overstepped their authority and given insufficient credit to the state's sensitivity to constitutional values. See Rhodes, 452 U.S. at 352, 101 S.Ct. at 2402; cf. Hewitt v. Helms, --- U.S. ----, ----, 103 S.Ct. 864, 867-868, 74 L.Ed.2d 675 (1983) (prison officials accorded great deference in prison management). In other cases, blatant state disregard for constitutional rights has forced even cautious and reluctant courts to intervene. Rhodes, 452 U.S. at 354, 101 S.Ct. at 2403 (Brennan, J., concurring); see, e.g., Pugh v. Locke, 406 F.Supp. 318, 328 (M.D.Ala.1976), aff'd as modified sub nom. Newman v. Alabama, 559 F.2d 283 (5th Cir.1977), rev'd in part on other grounds sub nom. Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam).
 
 
 88
 All the members of this panel agree that past conditions in the Oklahoma prisons constituted a systemic violation by Oklahoma of the eighth amendment proscription against cruel and unusual punishment. Indeed, Judge Barrett explicitly recognizes " 'the neglect, apathy and deliberate disregard for human decency and rights' " that pervaded the Oklahoma prisons in the past. Ante at 1525 (quoting Battle v. Anderson, 564 F.2d 388, 393 (10th Cir.1977)). Likewise, the members of this panel, as well as the district court, all agree that Oklahoma has made significant progress in ameliorating the disgraceful prison conditions of the past. In this regard, Judge Barrett finds that the State of Oklahoma has eliminated these conditions and has provided facilities that are "so modern, so spacious and so extensive as to be not only fit but most comfortable for prisoners." Ante at 1532. While we do not commend the present facilities so strongly, we nevertheless agree that present conditions, as described by the district court, appear constitutionally adequate under the standards set forth in Rhodes.
 
 
 89
 We diverge from Judge Barrett, however, on the question of the district court's continuing jurisdiction over the Oklahoma prison system. Finding no present constitutional violation, he believes that the district court should terminate its jurisdiction. In contrast, we believe that a court should exercise supervisory power over the suit until it can say with assurance not only that eighth amendment violations do not presently exist but that there is no reasonable expectation that unconstitutional conditions will recur.
 
 II
 
 90
 In reaching our conclusion, we note at the outset the special character of this litigation. This suit is not intended to resolve some narrow, discrete dispute between Messrs. Anderson and Battle; instead, it involves an intervention in the operation of a state institution to eliminate unconstitutional practices, an intervention that commentators have described as "structural reform." Fiss, Forward: The Forms of Justice, 93 Harv.L.Rev. 1 (1979); see, Resnik, Managerial Judges, 96 Harv.L.Rev. 376 (1982); Chayes, Forward: Public Law Litigation and the Burger Court, 96 Harv.L.Rev. 4 (1982). As Professor Fiss has perceptively stated,
 
 
 91
 the focus of structural reform is not upon particular incidents or transactions, but rather upon the conditions of social life and the role that large-scale organizations play in determining those conditions. What is critical is not the black child turned away at the door of the white school, or the individual act of police brutality. These incidents may have triggered the lawsuit. They may also be of evidentiary significance: evidence of a "pattern or practice" of racism or lawlessness. But the ultimate subject matter of the lawsuit or focus of the judicial inquiry is not these incidents, these particularized and discrete events, but rather a social condition that threatens important constitutional values and the organizational dynamic that creates and perpetuates that condition.
 
 
 92
 Fiss, 93 Harv.L.Rev. at 18 (footnote omitted).
 
 
 93
 In such cases the courts intervene, not simply to prevent isolated instances of misconduct, but rather to remove a threat to constitutional values posed by the manner of operation of the institution. Fiss, 93 Harv.L.Rev. at 22-23; see Estelle v. Gamble, 429 U.S. 97, 116-17 n. 13, 97 S.Ct. 285, 297 n. 13, 50 L.Ed.2d 251 (1976) (Stevens, J., dissenting). Accordingly, the court's remedies must be designed to achieve lasting institutional change. Fiss, 93 Harv.L.Rev. at 28.[2] The court's remedies typically take the form of prospective injunctions supported by continuing oversight to assure compliance. As Professor Fiss has noted, the remedial phase often extends well into the future, requiring the court to exercise continuing jurisdiction:
 
 
 94
 It involves a long, continuous relationship between the judge and the institution; it is concerned not with the enforcement of a remedy already given, but with the giving or shaping of the remedy itself. The task is not to declare who is right or who is wrong, not to calculate the amount of damages or to formulate a decree designed to stop some discrete act. The task is to remove the condition that threatens the constitutional values.... [T]he remedy involves the court in nothing less than the reorganization of an ongoing institution, so as to remove the threat it poses to constitutional values. The court's jurisdiction will last as long as the threat persists.
 
 
 95
 Fiss, 93 Harv.L.Rev. at 27-28; see Special Project, 78 Colum.L.Rev. at 816-17, 842-44.
 
 
 96
 We believe that the court, in exercising continuing jurisdiction to achieve structural reform, cannot terminate its jurisdiction until it has eliminated the constitutional violation "root and branch." See Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).[3] The court must exercise supervisory power over the matter until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that unconstitutional practices will recur.
 
 
 97
 The concept that a court's jurisdiction extends beyond the termination of the wrongdoing is not a novel idea; rather, it is based on traditional notions of the courts' equitable powers.[4] Moreover, a court's retention of jurisdiction beyond the point of compliance with its injunctions is not a novel practice. In past prison cases, courts have retained jurisdiction beyond the terms of the injunction "to make it reasonably certain that the changes of methods and practices will not be abandoned, forgotten, or neglected, but have become permanently established." Jones v. Wittenberg, 330 F.Supp. 707, 721 (N.D. Ohio 1971), aff'd sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir.1972); see Taylor v. Perini, 413 F.Supp. 189, 197 (N.D. Ohio 1976); see also, Special Project, 78 Colum.L.Rev. at 842-43 ("The permanent achievement of remedial objectives, rather than full implementation of the changes ordered in the decree, therefore, appears to be the outermost limit of judicial intervention.") (footnote omitted).
 
 
 98
 Future prison conditions are an outgrowth of present attitudes. The factual findings of the district court suggest that present attitudes in Oklahoma may well contain seeds from the past. The court found that past unconstitutional conditions threatened to recur, stating,
 
 
 99
 while the Court would not conclude from the evidence presented that the system has become unconstitutional in its operation, the system is clearly in the state of rapid decline. The system has slipped into the twilight of constitutional compliance and could well slip into its previous unconstitutional condition.
 
 
 100
 Battle v. Anderson, No. 72-95-CIV, mem. op. at 3-4 (E.D.Okla. Oct. 12, 1982). The record provides strong support for the district court's factual finding of a rapid decline in prison conditions. In a hearing preceding the court's decision, the court-appointed fact finder testified that the prisons were overcrowded, understaffed, and posed significant fire, safety, sanitation, and health hazards. He also noted serious deficiencies in the exercise, work, food, and recreation programs as well as self-mutilations and suicides. Indeed, he testified that in his opinion the prison system had already crossed the threshold of unconstitutional conditions, given the totality of the circumstances.
 
 
 101
 In light of its fully supported factual findings, the district court correctly chose to exercise continuing jurisdiction in this controversy. Present compliance is insufficient to bring an end to this litigation if the compliance is simply a transient excursion above the constitutional threshold. The district court has not only the authority but an obligation to prevent a regression of the Oklahoma prison system to the unconstitutional conditions of the past. When a prison system deteriorates to the point that a federal district court must step in to rectify unconstitutional conditions, the court should retain jurisdiction until it is satisfied that the unconstitutional conditions will not recur.
 
 III
 
 102
 While we conclude that the district court retains jurisdiction over the Oklahoma prison system, we also recognize limits to the scope of this jurisdiction. These limits are defined by the purpose of the continuing jurisdiction--to assure that the court's intervention has achieved lasting institutional reform. Accordingly, the court may exercise continuing jurisdiction over the Oklahoma prison system to the extent necessary to assure that eighth amendment violations will not recur.
 
 
 103
 The exercise of this jurisdiction must be entrusted to the discretion of the district court. Indeed, it "is the only court equipped to test evidentiary compliance and the only forum in which to raise any allegations of continuing deficiencies." Finney v. Arkansas Board of Correction, 505 F.2d 194, 215 (8th Cir.1974). Absent a conclusion that the district court has made clearly erroneous factual findings or has abused its discretion, we have no authority to overturn its determination of the need for continuing jurisdiction. In this case the district court has amply demonstrated the need for continuing jurisdiction. Furthermore, the district court has demonstrated a clear understanding of the scope of its supervisory powers. The court stated as follows:
 
 
 104
 The court has been careful to use the term indefinite relief due to the recognition that the standard applicable to this case is that characterized by the "totality of circumstances." While Rhodes stands for the proposition that populations in excess of the rated capacity cannot be declared per se unconstitutional; neither can any set ratio be declared absolutely constitutional. Thus, the determination of constitutional conditions must inherently involve a continuing review of population figures, as one of the multiple relevant factors. The court must stand ready to act should any factor causally swing the balance of the totality of the circumstances past the line separating constitutional from unconstitutional conditions.
 
 
 105
 Battle v. Anderson, No. 72-95-CIV, mem. op. at 3 (Oct. 12, 1982) (footnotes omitted). The court's order, made pursuant to its exercise of continuing jurisdiction, provides in pertinent part that
 
 
 106
 the defendants shall file with the Clerk of the Court an official statement of penal policy and detailed plan of action describing measures that will be used to avoid the return of the Oklahoma prison system to unconstitutional conditions and date of compliance with the agreed to stipulations of January 22, 1981.
 
 
 107
 Id. at 8. The court order is limited in scope and is targeted to assure compliance with past decrees and to prevent a recurrence of unconstitutional conditions.[5] Accordingly, it should be affirmed in full.[6]
 
 
 
 [1]
 In a past episode of this case, the district court determined that conditions in the Oklahoma prison system violated the eighth amendment's proscription of cruel and unusual punishment. See Battle v. Anderson, 376 F.Supp. 402 (E.D.Okl.1974). Since that time, the district court has engaged in a continuing struggle to remedy the constitutional violations. See Battle v. Anderson, 447 F.Supp. 516 (E.D.Okl.), aff'd, 564 F.2d 388 (10th Cir.1977); Battle v. Anderson, 457 F.Supp. 719 (E.D.Okl.1978), remanded for further hearings, 594 F.2d 786 (10th Cir.1979)
 
 
 [2]
 See generally, Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976); Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum.L.Rev. 784 (1978); Note, Complex Enforcement: Unconstitutional Prison Conditions, 94 Harv.L.Rev. 626 (1981); Note, Implementation Problems in Institutional Reform Litigation, 91 Harv.L.Rev. 428 (1977); Note, The Wyatt Case: Implementation of a Judicial Decree Ordering Institutional Change, 84 Yale L.J. 1338 (1975)
 
 
 [3]
 In Green, a classic example of structural reform of segregated schools, the Court stated that "the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." 391 U.S. at 439, 88 S.Ct. at 1695; accord, Raney v. Board of Educ., 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968); see also Brown v. Board of Educ., 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1954) (district court to retain jurisdiction during "period of transition" to desegregated schools)
 
 
 [4]
 It has long been settled that the court's power to grant injunctive relief survives discontinuance of the illegal conduct. E.g., United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1952). In this regard, the Supreme Court has noted that "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." United States v. Oregon State Medical Soc'y, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952). More recently, the Court has pointed out that "abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982) (footnote omitted; emphasis added)
 These principles apply with equal force once a court has intervened and provided prospective injunctive relief. If an injunction is to be effective, a court must retain continuing jurisdiction to enforce and modify the terms of its orders. See Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573-2574, 57 L.Ed.2d 522 (1978); System Fed'n No. 91 Ry. Employes' Dep't v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). See generally, O. Fiss, The Civil Rights Injunction (1978). The court cannot be divested of jurisdiction by temporary compliance with the injunction. As in the case of pretrial abandonment, see County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), a court must retain jurisdiction until it can say with assurance that there is no reasonable expectation that the unlawful activity will recur.
 
 
 [5]
 The stipulations of January 22, 1981, with which the order requires eventual compliance, include provisions for single-celling and specific space requirements. As the district court recognizes, these provisions may be adjusted in the future in light of the totality of the circumstances without compromising constitutional standards. See Rhodes, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59. Given the state of declining prison conditions, the court acted properly in retaining, for the present, the obligation of eventual compliance
 
 
 [6]
 We commend Judge Bohanon for the skill and fortitude exercised over the past ten years in administering this difficult and demanding case